UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WELLS FARGO BANK, N.A., *solely in its capacity as trustee for Soloso CDO 2005-1 Ltd.*, <br><br>     Plaintiff, <br><br>     v. <br><br> HOLDCO ASSET MANAGEMENT, L.P; HOLDCO OPPORTUNITIES FUND II, L.P; and OPPORTUNITIES II LTD., <br><br>     Defendants. | Case No. 16-cv-6356 (KBF) |

## HOLDCO ENTITIES' MEMORANDUM OF LAW IN OPPOSITION TO WELLS' MOTION FOR SUMMARY JUDGMENT

**LEPORE & ASSOCIATES, P.C.**
Lauren B. Lepore (LL-0772)
200 Park Avenue, 17th Floor
New York, New York 10166
Phone: (646) 632-3786
Email: llepore@leporelawfirm.com

-and-

**JEFFREY D. STERNKLAR LLC**
Jeffrey D. Sternklar
225 Franklin Street, 26th Floor
Boston, Massachusetts 02110
T: (617) 396-4515

*Attorneys for Defendants/Counterclaim Plaintiffs Holdco Asset Management, L.P.; HoldCo Opportunities Fund II, L.P. and Opportunities II Ltd.*

i

# **TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………….…… 1

LEGAL STANDARD…………………………………………………………….….. 2

ARGUMENT………………………………………………………………….……… 3

I.  The HoldCo Entities Are Entitled to Summary Judgment for the Reasons Set forth   3
in the Cross-Motion……………………………………………………….……….

II. Wells' Primary Argument Is Predicated on a Gross Misunderstanding of the Case   4
Law………………………………………………………………….……….

    a.  Wells Misinterprets Its Primary Case, *Drew v. John Deere Co. of*   4
    *Syracuse*………..

    b.  Wells Ignores a Substantial Body of Case Law With Respect to Auctions   6
    Without Reserve……………………………………………………..………..

    c.  Wells Relies on the Uniform Commercial Code Which Is Irrelevant to the   8
    Sale of Securities……………………………………………………………...

III. Wells Second Argument Is Predicated on a Gross Misunderstanding of Section 3(a)   9
of                             the                             November
Procedures……………………………………………………….………...

IV. Wells Failure to Address the Custom and Practice in the Industry Requires the Denial   16
of                             the                             Wells
MSJ……………………………………………………………….………….

V.  Assuming Arguendo that the January Auction was "with reserve", Wells Failed to   22
Actually Set Reserves……………………………………………………………….

VI. Wells' Does Not Have Standing to Seek Relief on Behalf of Third   22
Parties……………..

CONCLUSION…………………………………………………………….………… 23

**TABLE OF AUTHORITIES**

**Cases**

1. *Albany Savings Bank v. Halpin*, 117 F.3d 669 (2d Cir. 1997)……...………………….....3, 16

2. *Carteret Assisted Living, LLC v. N.J. Hous. & Mortg. Fin. Agency,* 2007 N.J. Super. Unpub. LEXIS 16 (N.J. Super. Ct. App. Div. 2007)…………………….. ……………………….7

3. *Carver v. Teitsworth,* 1 Cal.App.4th 845, 2 Cal.Rptr.2d 446 (Cal. Ct. App. 1991)………....8

4. *Cody v. Stalter,* 1988 Ohio App. LEXIS 2698 (Ohio App. 6th 1988)……………...………6, 7

5. *Drew v. John Deere Co. of Syracuse,* 19 A.D.2d 308, 241 N.Y.2d 267 (4th Dep't 1963)………………………………...…………………………………………….*passim*

6. *Ferry v. Udall*, 336 F.2d 706 (9th Cir. 1964)……………………………. …………………..15

7. *Forbes v. Wells Beach Casino, Inc.*, 207 A.2d 210 (Me. 1973)…………………….......…4, 7

8. *Golfinopoulos v. Padula*, 218 N.J. Super. 28, 526 A.2d 1107 (N.J. Super. Ct. App. Div. 1987)……………………...…………………………………6, 7, 8

9. *Hunt v. Wash. State Apple Adver. Comm'n.*, 432 U.S. 333, 343 (1977)……………………23

10. *In re New York Skyline, Inc.*, 471 B.R. 69 (Bankr. S.D.N.Y. 2012)…………………………11

11. *Jacobson v. Sassower*, 66 N.Y.2d 991, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (N.Y. 1985).3,16

12. *Jenkins Towel Serv., Inc. v. Fidelity-Philadelphia Trust Co.*, 400 Pa. 98, 161 A.2d 334 (Pa. 1960)…………………………………………………………………………………..7

13. *Lawrence Paper Co. v. Rosen & Co.*, 939 F.2d 376 (6th Cir. 1991)……………..…...8, 14, 15

14. *Lim v. The.TV Cor. Internat.,* 99 Cal.App 4th 684 (Cal. Ct. App. 2002)…………………….9

15. *Miami Aviation Serv. v. Greyhound Leasing & Fin. Corp.*, 856 F.2d 166 (11th Cir. 1988)……………………………………………………………………………………..8

16. *Page Mill Asset Management v. Credit Suisse First Boston Corp.*, 20000 WL 335557 (S.D.N.Y. Mar. 30, 2000)…………………………………………………………………...4

17. *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166 (2d Cir. 2012)……………..……………...2

18. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98 (2d Cir. 2011), cert. denied, 132 S.Ct. 1744 (2012)……………………………………………………………………...2

19. *Short v. Sun Newspapers, Inc.*, 300 N.W.2d 781 (Minn. 1980)……...………………*passim*

20. *Truman Capital Advisors LP v. Nationstar Mortgage LLC*, 2014 U.S. Dist. LEXIS 118246 (S.D.N.Y. Aug. 25, 2014)…………………………………………...…………………15

21. *Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45 (1st Cir. 2010)……………………………………………………………………………..1

**Statutes and Rules**

1. Fed.R.Civ.P 12(b)(7)…………………………………………………………………23

2. Fed.R.Civ.P. 19…………………………………………………………………………23

3. Fed.R.Civ.P. 20…………………………………………………………………………23

4. Fed.R.Civ.P. 56(a)…………………………………………………………………………2

5. N.Y. U.C.C. Law §1205…………………………………………………………………9

6. N.Y. U.C.C. Law §2-102…………………………………………...…………………8

**Other Authorities**

1. Corbin on Contracts, §4.14……………………………………………...……*passim*

2. Restatement (Second) of Contracts, §28……………………………………...…*passim*

3. Williston on Contracts, Third Edition, §29……………………………………………6

4. 7 N.Y. Jur. 2d Auctions and Auctioneers § 25 (2015)…………………………………25

5. 7 N.Y. Jur. 2d Auctions and Auctioneers § 34 (2015)…………………...………………6, 9

Defendants/Counterclaim Plaintiffs HoldCo Asset Management, L.P. ("HoldCo"), as manager and power of attorney for HoldCo Opportunities Fund II, L.P. ("HoldCo II") and Opportunities II Ltd. ("Opps II," and together with HoldCo and HoldCo II, the "HoldCo Entities"), submit this memorandum of law in opposition to the motion for summary judgment (the "Wells MSJ") filed by Wells Fargo Bank, N.A. ("Wells").

## INTRODUCTION

As set forth in the HoldCo Entities' Cross-Motion for Summary Judgment (the "Cross-Motion"),[1] which is being filed concurrently herewith, the HoldCo Entities are entitled to summary judgment based on the clear and unambiguous terms of the documents governing the auction conducted on January 21, 2016 (the "January Auction") and the incontrovertible practice with respect to CDO liquidations. However, regardless of whether the Cross-Motion is granted or denied, the Wells MSJ must be denied for the reasons set forth herein.

In the Wells MSJ, Wells makes two arguments: (i) that the absence of the phrase "without reserve" in its auctions notices means, as a matter of law, that the January Auction, was "with" reserve and (ii) that based on a specific provision, it contractually reserved its right not to sell items in the January Auction to the highest qualified bidders after bids had been submitted. In making these two arguments, Wells has ignored the relevant case law, misinterpreted its own case law, misunderstood the contractual provision that it references, and failed to set the reserves that it claims to have set.

Finally, Wells completely ignores the custom and practice in auctions of collateral by trustees of defaulted CDOs, otherwise known as "CDO liquidations," which must be included in any analysis of the November Notices and the January Auction. This industry custom and

---

[1] The HoldCo Entities are filing the Cross-Motion concurrently herewith, and, under applicable case law, the Court should consider the Cross-Motion simultaneously with the Wells MSJ. *Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 51 (1st Cir. 2010).

practice is laid out in the Affidavit of Julie Veltman (the "Veltman Affidavit"), filed concurrently herewith, and is uncontroverted by Wells. In the Veltman Affidavit, Ms. Veltman, an established expert in CDO liquidations- testifies that in CDO liquidations driven by an event of default, like the January Auction, that market participants "assume that all items being auctioned [in a CDO liquidation] will trade [to the highest qualified bidder]" and that the "only reason to assume otherwise would be if it was [sic] prominently conveyed that a specific CDO auction would behave differently than the expected norm." Veltman Affidavit, ¶24.

Against this backdrop, if Wells had wanted the January Auction to be *with* reserve, market practice demanded that Wells specifically disclose that fact. And, as shown in the Veltman Affidavit, Wells had the means and the method for disclosing reserves; it simply elected not to do so in the January Auction. *Id.*, ¶¶ 24; 26. Instead, Wells, for whatever reason, elected to mislead the market into believing that the January Auction was *without* reserve.

Although, as set forth herein and in the Cross-Motion, the HoldCo Entities submit that they are entitled to summary judgment on the merits and the uncontroverted facts, even if this Court determines that they are not, the Wells MSJ must fail for the reasons set forth herein.

## LEGAL STANDARD

Summary judgment is not appropriate when there are genuine issues of material fact. Fed.R.Civ.P. 56(a). The moving party for summary judgment bears the burden of showing that there are no genuine issues of material fact. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1744 (2012). In evaluating a summary judgment motion, "the evidence of the non-movant is to be believed; [and] all permissible inferences are to be drawn [in the non-movant's] favor." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). If a contract is ambiguous, it

must be construed against the drafter. *Albany Savings Bank v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) ("New York contract law includes the rule that ambiguities in contracts should be construed against the drafter."); *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283 (N.Y. 1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language."). It is undisputed that Wells drafted the November Notices.

## ARGUMENT

### I. The HoldCo Entities Are Entitled to Summary Judgment for the Reasons Set forth in the Cross-Motion

As an initial matter, and as set forth in greater detail in the Cross-Motion, the HoldCo Entities are entitled to summary judgment on the merits. The November Notices[2] created a closed auction and explicitly and in no uncertain terms provided that (i) the collateral would be sold to the highest qualified bidder on a date certain   (Ex. J, pg. 1, §3(o));[3] (i) the highest qualified bid was the winning bidder (*Id.*, §3(a); 3(c)) and (iii) the highest qualified bidder would receive delivery of the relevant item of Collateral on a date certain (within three business days) pursuant to the customary mechanisms used to settle securities (*Id.*, §3(o)). Consequently, the November Notices are on all fours with the case law, which provides that an auction is "without" reserve if the governing documents state that the item being sold will (a) trade to the highest bidder (b) on a specific date. The November Notices also go the extra mile to comply with the

---

[2] As used herein, the term "November Notices" means collectively the Notification of Public Disposition of Collateral sent by Wells to Soloso CDO 2005-1 Ltd. on November 18, 2015 (the "November Announcement") (Ex. I) and the Notice of Public Sale and Invitation to Bid dated November 20, 2015 (the "November Procedures") (Ex. J).

[3] Exhibits A through T are exhibits to the accompanying Affidavit of Vikaran Ghei in support of the HoldCo Entities' Motion for Summary Judgment and Opposition to Wells' Motion for Summary Judgment (the "Ghei Affidavit"). Exhibits 1 through 2 are exhibits to the accompanying Affidavit of Julie Veltman in Support of the HoldCo Entities' Motion for Summary Judgment and Opposition to Wells' Motion for Summary Judgment (the "Veltman Affidavit"). Exhibits are cited herein as "Ex. __."

case law by providing for closed/sealed bidding. *Id.*, §3(l). Finally, it is uncontroverted that market participants understand and expect that CDO liquidations, such as the January Auction, are without reserve, especially when the auction is governed by form bid procedures similar to the November Notices. *See* Section IV *infra*. Consequently, and as set forth in the Cross-Motion, the HoldCo Entities are entitled to summary judgment and the Wells MSJ should be denied.

## II.   Wells' Primary Argument Is Predicated on a Gross Misunderstanding of the Case Law

The backbone of the Wells MSJ is Wells' central argument that the "typical" auction is with reserve and that only way for an auction to be "without" reserve is for the magic words "without reserve" to actually be included, verbatim, in the auction notice.[4] *See generally* Wells MSJ, page 10. This argument is absolutely wrong.

### a.   Wells Misinterprets Its Primary Case, *Drew v. John Deere Co. of Syracuse*

Wells' (mis)understanding – and its case for summary judgment – is premised on *Drew v. John Deere Co. of Syracuse* which states "an auction sale is not 'without reserve' unless expressly so announced." 19 A.D.2d 308, 310, 241 N.Y. 2d 267, 270 (4th Dep't 1963). But this language does not stand for the proposition that the magic words "without reserve" are required in auctions without reserve and neither does *Drew*.

---

[4] In the Wells MSJ, Wells also asserts that "[i]t is undisputed that Guggenheim and Sandler's bids were not accepted by Dock Street" and implies, based on a citation to *Page Mill Asset Management v. Credit Suisse First Boston Corp.*, that the use of the term "bid" is somehow determinative of whether the January Auction was with or without reserve. Case No. 98-060907 (MBM), 2000 WL 335557, at *7 (S.D.N.Y. Mar. 30, 2000). These types of statements and implications, however, are simply Wells drawing legal conclusions and hoping to mislead this Court by misusing the terminology of auctions. If the January Auction were without reserve, the bids were not offers but acceptances of Wells' offer to sell, and Dock Street's affirmative "acceptance" was not relevant. Ultimately, it is the Court's prerogative, not Wells', to determine whether the bids were (i) offers, requiring acceptance, or (ii) acceptances. *See Short v. Sun Newspapers, Inc.*, 300 N.W.2d 781, 787 (Minn. 1980) ("Appearance of the word 'bid' . . . does not dictate their legal effect."); *Forbes v. Wells Beach Casino, Inc.*, 307 A.2d 210, 216 (Me. 1973) ("the contract's use of the words 'offer' and 'acceptance' is not necessarily determinative of the issue. We must find the parties' intent from the whole contract.").

In *Drew*, the question was whether either the plaintiff (the bidder) or the defendant (the seller) were entitled to summary judgment based on the language of the auction notice. *Drew*, in its holding, rejected *both* motions for summary judgment and stated that the plaintiff "should be given an opportunity to produce any other evidence he may have on [whether the auction was without reserve]." *Id.* at 312-13, 272.[5] Consequently, *Drew*, by rejecting the seller's motion for summary judgment and looking outside the contract, also rejected the notion that the only way to have an auction without reserve was to include the phrase "without reserve" in the auction notice.

*Drew* is also therefore consistent with relevant auction and hornbook law which provides that any auction notice need not include the phrase "without reserve" to create an absolute auction and should be interpreted against the backdrop of the relevant industry in which the auction is being conducted – a reality that Wells ignores. *See, e.g.,* Corbin on Contracts, §4.14; Restatement (Second) of Contracts, §28 cmt a; *see also Short*, 300 N.W.2d at 787. And as discussed below, industry custom and practice is clear that *all* CDO liquidations are presumed to be without reserve unless there is a prominent disclosure to the contrary and that the November Notices are understood by the industry to create an auction without reserve. *See* Section IV *infra*.

However, even ignoring *Drew's* actual ruling – as Wells does – *Drew* still does not stand for the proposition that the magic words "without reserve" must be specifically included to create an auction without reserve. As an initial matter, *Drew* dealt with the sale of a truck, not the sale of securities in a market governed by its own established custom and usage, and was decided under Article II of the Uniform Commercial Code (the "UCC"). On that ground alone, as discussed below, it is inapposite. Second, *Drew* itself relies on Corbin on Contracts (*Id.* at 311)

---

[5] *Drew* is not alone in rejecting summary judgment if relevant facts are not on the record. *Short*, 300 N.W.2d at 787 ("[I]t appears to us that whether the solicitation for Short's bid was an offer or only an invitation to make an offer is a question of fact that cannot be decided summarily.")

and, as discussed below, Corbin specifically holds that the magic words "without reserve" are not necessary to create an absolute contract. *See* Corbin on Contracts, §4.14.

### b. Wells Ignores a Substantial Body of Case Law With Respect to Auctions Without Reserve

Wells' assertion that the magic words "without reserve" are required is not otherwise supported by the case law. Instead, all that is required for an auction to be without reserve is for the seller to express the "intention" for the auction to be absolute either by using the magic words "without reserve" or any form of words. *See* Restatement (Second) of Contracts, §28(1) (holding that an auction is without reserve if such "intention is manifested"); Corbin on Contracts, §4.14 ("All that is necessary [for a sale to be without reserve] is that seller shall express such an intention clearly and bring it sufficiently to the attention of the bidders. One mode of expression. . . [is] If the seller states. . . that the sale will be 'without reserve.'); Williston on Contracts, Third Edition § 29 (". . . [the seller] might make himself the offeror by using language appropriate to the purpose, that is, by using language which, fairly interpreted, amounts to a promise on his part to sell to any person who shall make the highest bid. The announcement that he will sell without reserve, ***made in any form of words,*** would justify this interpretation.") (emphasis added); 7 N.Y. Jur. 2d Auctions and Auctioneers § 34 (2015) ("Whether statements or conditions of the sale are sufficiently explicit to make the sale without reserve is to be determined by ordinary principles that govern the interpretation of contracts"); *see also Cody v. Stalter*, 1988 Ohio App. LEXIS 3698, *5-6 (Ohio App. 6th 1988) (finding that the phrase "'WILL SELL TO HIGHEST BIDDER' indicates an auction 'without reserve" and constitutes "***explicit*** language that the auction. . . would be without reserve.") (emphasis added); *Golfinopoulos v. Padula*, 218 N.J. Super. 38, 526 A.2d 1107 (N.J. Super. Ct. App. Div. 1987) (finding that the phrase "without reserve" was not needed to create an auction without reserve);

6

*Short*, 300 N.W.2d at 787 ("The phrase 'without reserve' is not a formal requirement, just customary at auctions, and equivalent language will have the same effect. An announcement that goods will be sold 'to the highest bidder' is said to be the equivalent.") (citations omitted); *Forbes*, 307 A.2d at 217 (analyzing all of the terms contained in the bid procedures and finding that the auction was without reserve despite not containing the phrase "without reserve").

Further, rather than requiring the magic words "without reserve," courts have routinely held that an absolute auction is created – *i.e.* an intent is manifested – if the notice includes language stating the item being auctioned will (i) trade to the highest bidder (ii) on a specific date. Furthermore, if the auction is a closed auction, like the January Auction, where bids are submitted in writing, courts are even more inclined to find an auction absolute if the two elements set forth above are present. As argued in the Cross-Motion, the November Notices unambiguously satisfy each of these elements. The seminal case showing that this construction creates an absolute auction is *Golfinopoulos v. Padula*. 218 N.J. Super. 38, 46, 526 A.2d 1107, 1111 (N.J. Super. Ct. App. Div. 1987) (finding that language stating that the item "will definitely be awarded on Friday, May 30, 1986, to the highest responsible bidder" was sufficient to create an auction without reserve.). But not all courts are as strict as *Golfinopoulos*. For example, in *Cody v. Stalter*, the court found that simply including the phrase "WILL SELL TO HIGHEST BIDDER" was enough to show the ***explicit*** intent to sell without reserve. *Cody*, 1988 Ohio App. LEXIS 3698 at *5-6; *see also Jenkins Towel Serv., Inc. v. Fidelity-Philadelphia Trust Co.*, 400 Pa. 98, 104-05, 161 A.2d 334, 334-38 (Pa. 1960).

Finally, as discussed in the Cross-Motion, the case law discussing the manner in which an intent to sell without reserve is manifested is not limited to *Golfinopoulos* or *Cody*. Instead, it is representative of a long line of cases. *See, e.g., Carteret Assisted Living, LLC v. N.J. Hous. &*

7

*Mortg. Fin. Agency*, 2007 N.J. Super. Unpub. LEXIS 16 (N.J. Super. Ct., App. Div. 2007); *Carver v. Teitsworth*, 1 Cal.App.4th 845, 851-52, 2 Cal.Rptr.2d 446, 449-50 (Cal. Ct. App. 1991); *Short*, 300 N.W.2d at 786-87; *Jenkin*, 400 Pa. at 104-05, 161 A.2d at 337-38; Restatement (Second) of Contracts, §28, cmt c, illus. 3; 7 Am. Jur. 2d Auctions and Auctioneers, § 14; Corbin on Contracts, §4.14 n.6 (same). Again, these cases are not contingent on the inclusion of the phrase "without reserve," and they are not unique or outliers.

Consequently, the fact that the phrase "without reserve" was not included in the November Notices is not determinative. Instead, the Court should look both to the entirety of the November Notices (rather than for a single phrase) and industry custom and usage to determine whether the January Auction was without reserve. Wells fails to mention this because Wells understands that the November Notices, when viewed in their entirety, satisfy the *Golfinopoulos* or *Cody* tests and establish an absolute auction. Wells also understands that the custom and usage in CDO liquidations dictates that the January Auction was an absolute auction.

###     c.  Wells Relies on the Uniform Commercial Code Which Is Irrelevant to the Sale of Securities

The cases cited in the Wells MSJ involving the sale of goods pursuant to Article II of the UCC are inapposite to this case, which involves the sale of securities. *See Lawrence Paper Co. v. Rosen & Co.*, 939 F.2d 376 (6th Cir. 1991); *Miami Aviation Serv. v. Greyhound Leasing & Fin. Corp.*, 856 F.2d 166 (11th Cir. 1988); *Drew*, 19 A.D.2d 308, 241 N.Y.S.2d 267. Article II, by its terms, does not apply to the sale of securities. UCC, §2-102. Moreover, cases applying the UCC recognize that the *Golfinopoulos* standard (which is affirmed in the Restatement (Second) of Contracts), applies for creating an auction without reserve if the item being auctioned is not a "good" (i.e., the item (i) will trade to the highest bidder (ii) on a specific date). A prime example of this line of cases was cited in the Wells MSJ. *See Miami*, 856 F.2d at 167 (distinguishing the

standards for creating an absolute auction under Article II of the UCC from auctions for real property); *see also Lim v. The.TV Corp. Internat.*, 99 Cal.App. 4th 684, 692 (Cal. Ct. App. 2002) (holding that the UCC did not apply to the sale of a domain name and that courts should look to the Restatement (Second) of Contracts instead, which creates an absolute auction if the notices states that the item will sell to the highest bidder on a date certain).

However, even assuming, arguendo, that Article II of the UCC applies to the sale of securities, the UCC also provides that custom and usage must also be taken into consideration when determining whether goods are "put up without reserve" for the purposes of Section 2-328. UCC, Art. I, § 1-205; *see also* Restatement (Second) of Contracts, §28 cmt a; 7 N.Y. Jur. 2d Auctions and Auctioneers § 34 n.13. This is especially true in an industry, like CDO liquidations, with their own well-established practices and customs.

### III.   Wells Second Argument Is Predicated on a Gross Misunderstanding of Section 3(a) of the November Procedures

Wells cites to Section 3(a) of the November Procedures for the proposition that Wells "expressly reserved its right not to sell the Subject Securities, no matter the results of the auction." Wells MSJ, pg 10. Section 3(a) simply states "[Wells] shall not be obligated to make any Sale and reserves the right to sell all or part of the Collateral at a subsequent public or private Sale." Ex. J, §3(a).

As an initial matter, the terms "Sales" and "Sale" were clearly and consistently defined in both the November Announcement and the November Procedures as the five public sales of "Collateral," which were to be held on December 8 and 16, 2015, and January 14, 21 and 28, 2016. It is uncontroverted that these five public sales, including the January Auction, were "Sales." "Collateral" was also defined in the November Notices to mean the individual trust preferred securities owned by Soloso that were to be sold in a specified "Sale." Specifically, the

November Procedures stated that "the collateral described below (the 'Collateral'). . . will be sold at sales, as indicated below (the 'Sales')" and included a chart showing the dates and times of each "Sale" and the specific items of collateral that would be sold at each "Sale." *Id.*, pg. 1; §§ 1-2. The January Auction was the fourth of the five "Sales" and was scheduled for 10:00 ET on Thursday, January 21, 2016. *Id.* The January Auction was thus itself a "Sale" at which numerous items of "Collateral" were auctioned.

The language in Section 3(a) therefore did allow Wells *not* to hold a "Sale," and, as such, Wells could postpone or adjourn a "Sale." Wells could not, however, move forward with the January Auction (*i.e.* a "Sale") but refuse to sell an item of Collateral being auctioned in that Sale once a qualified bidder submitted the highest bid for that item of Collateral. Thus, Wells could have adjourned the January Auction, but once Wells decided to move forward with the January Auction and qualified bids were submitted, Wells could not choose to sell certain items of Collateral but not others. Wells concedes it went forward with the January Auction and in fact sold seven (7) individual items of Collateral in the January Auction. Because Wells elected to proceed with the January Auction (which was a "Sale"), Wells was required to deliver the Subject Collateral to the highest qualified bidders – *i.e.* the HoldCo Entities.

Wells, however, argues that despite the uncontroverted fact that that the plural term "Sales" was explicitly and unambiguously defined in the November Notices, the absence of an explicit definition of the singular term "Sale" in the November Notices requires that bidders refer to the Indenture – an entirely separate document only available upon request – in order to parse its meaning. To support this contention, Wells points to the language in the November Procedures stating "Capitalized terms used herein and ***not otherwise defined*** shall have the meanings assigned to such terms in the Indenture." (emphasis added). Wells thus asserts that

10

"Sale" means the "sale of a portion of the trust estate" (Indenture, §5.18)[6] rather than one of the five enumerated "Sales" provided for in the November Notices. Wells' interpretation of the meaning of the word "Sale" strains basic common sense and principles of contract interpretation; is not grounded in the terms of either the November Notices or the Indenture; and is not consistent with at least one prior auction notice that is nearly identical to the November Procedures.

*First*, it is a basic tenet of contract law that words should have their ordinary meanings. Wells' interpretation of the term "Sale" would "strain[] the contract language beyond its reasonable and ordinary meaning." *In re New York Skyline, Inc.*, 471 B.R. 69, 87 (Bankr. S.D.N.Y. 2012). The ordinary meaning of "Sale" is the singular of "Sales," and, since it is agreed that "Sales" is a defined term in the November Notices, the ordinary meaning of "Sale" would be one of the five enumerated "Sales." If Wells had wanted the term "Sale" to have a different meaning then "Sales," it could easily have made that clear. It did not. If Wells' assertion is accepted it would lead to the absurd conclusion that the singular "Sale" has a meaning entirely divorced from the plural "Sales."

*Second*, the November Procedures are otherwise constructed with the understanding that when a plural term is defined but the singular form is not, a prospective bidder is to refer to the plural to determine the meaning of the singular. For example, in Section 1 of the November Procedures, Wells defines the "Bid Response Spreadsheets" (plural) as the five Bid Response Spreadsheets included as Exhibits B-1 through B-5; however, the term "Bid Response Spreadsheet" (singular) is not explicitly defined but is used repeatedly in the November Procedures. Ex. J, §1. Wells clearly could not and would not allege that the singular Bid

---

[6] As used herein, the term "Indenture" means that certain indenture, dated August 24, 2005, by and between Soloso CDO 2005-1 Ltd., Soloso CDO 2005-1 Corp. and Wells, a copy of which was attached to the Brehm Affidavit as Exhibit 1.

Response Spreadsheet – simply because it is not explicitly and separately defined – is not one of the five Bid Response Spreadsheets. Any such allegation would be nonsensical in the same way that Wells' argument that the singular "Sale" is different than the plural "Sales" is nonsensical.

**Third**, Wells' cross-reference to the Indenture creates an absurd conflict that cannot be reconciled by Wells' interpretation. Section 1.1 of the Indenture provides that the singular form of a word captures the plural. Consequently, when the Indenture defines "Sale" in Section 5.18, it is actually defining both "Sale" and "Sales," and, in fact, the terms "Sale" and "Sales" are used interchangeably through the Indenture. Wells, however, does not argue that the plural "Sales" in the November Notices takes on the definition of the defined term "Sales" in the Indenture nor does Wells argue that the plural "Sales" in the Indenture takes on the definition of the term "Sales in the November Notices. Doing so would be logically inconsistent, not to mention immensely confusing, yet this is how Wells would like the Court to believe prospective bidders would rationally interpret the November Notices.

**Fourth,** Wells' argument is inconsistent with its past practices – which, as discussed in Section IV *infra*, must be considered when interpreting the November Notices. In the Notice of Public Sale and Invitation to Bid, dated June 3, 2013, for Tropic CDO I Ltd. (the "Tropic Procedures"), which is virtually identical to November Procedures,[7] Wells utilized the term "Sale" in the same way as it did in the November Procedures. However, the Tropic Procedures only noticed up one auction, rather than the five noticed up by the November Procedures. Because of this discrepancy, the Tropic Procedures naturally defined the term "Sale" using the phrase "[the collateral], which will be sold at a Sale, as indicated below (**the 'Sale'**)" (Ex. G, pg 1 (emphasis added)) (while the November Procedures naturally adapted the same phrase to

_____

[7] A copy of the Tropic Procedures is attached to the Ghei Affidavit as Exhibit G, and a redline showing the differences between the Tropic Procedures and the November Procedures is attached as Exhibit N.

define the multiple auctions at issue: "[the collateral] will be sold at sales, as indicated below (*the 'Sales'*)" (Ex. J, pg. 1 (emphasis added)). With the exception of this one difference, the Tropic Procedures were virtually identical to the November Procedures. These were form documents, and in drafting the November Procedures, Wells' counsel for the Soloso matter – who on information and belief was also Wells' counsel in connection with the Tropic Procedures – simply took the Tropic Procedures and adapted it to reflect five auctions instead of one auction. It is disingenuous and outright deceptive, then, for Wells to now argue that the term "Sale" as used in the November Procedures is meant to be an undefined term whose meaning can only be found in an entirely separate document, the Indenture.

*Fifth*, Wells' understanding that a "Sale" is one of the enumerated "Sales" per the November Notices is corroborated by the subsequent auction of Soloso Collateral that Wells conducted in April 2016 pursuant to the Notice of Public Sale and Invitation to Bid, dated April 1, 2016 (the "April Procedures"). In the April Procedures, Wells stated that the Collateral "will be sold at a number of sales, as indicated below (each a 'Sale' and collectively, the 'Sales')." Ex. L, page 1. Consequently, Wells went out of its way to clarify the definition of "Sale" as one of the "Sales" in the April Procedures (although the definition was plenty clear in the November Procedures and the Tropic Procedures).

*Sixth,* although the HoldCo Entities submit that Wells' interpretation of the word "Sale" is simply incorrect, to the extent this Court finds Wells to be technically correct, it must find that Wells' argument is contrary to the inherent duty of good faith in contracts. Wells argues that it deliberately chose to use a capitalized term that is the singular form of a clearly defined plural term and now contends that prospective bidders should have reasonably determined that the meaning of the singular term was to be found in an entirely separate document – an indenture

which is only available upon request. This is affirmatively deceptive. It is especially so when Wells' textual argument for why the January Auction was with reserve is premised solely upon that allegedly hidden definition. Wells MSJ, Section II.

**Seventh**, even assuming *arguendo* that Wells' interpretation of "Sale" is correct, Section 3(a) would still not allow Wells to avoid delivering Collateral once qualifying bids were submitted and thus did not constitute a reservation of rights. Under the November Procedures, and as discussed in the Cross-Motion, the Best Bidder's submission of the "highest qualified bid" was an acceptance of Wells' offer to sell, at which an *ipso facto* obligation to deliver the relevant Collateral became operative. Consequently, by arguing that it could collect all bids and then determine not to go forward with a Sale, Wells is arguing that it had the right to reject the highest qualifying bid *after* acceptance. This formulation constitutes a "conditional auction," not even an auction with reserve as argued by Wells. A conditional auction is a third type of auction, which allows a seller to reject bids "after the sale." *Lawrence Paper*, 939 F.2d at 378. However, conditional auctions are *expressly* prohibited unless bidders "have actual or constructive notice of the condition[]," which was simply not the case in the January Auction and was certainly not made clear in Section 3(a). *Id.*, at 379.

**Eighth,** that Section 3(a) and 3(g) include specific language allowing Wells to reject objectively non-qualifying and unlawful bids[8] is further proof that Section 3(a), on which Wells hangs its hat, was not a blanket reservation of rights that would allow the Trustee to avoid delivering an item of Collateral to the highest qualified bidder. These specific clauses that allow

---

[8] Wells notably does not refer to this provision in the Wells MSJ because for Wells to be able to exercise that discretion a bid must have been procedurally unsatisfactory or unlawful, and the HoldCo Entities' bids were lawful and procedurally satisfactory. And, at no time prior to, during or in the months after the January Auction did Wells or Dock Street suggest that the HoldCo Entities' bids were non-qualifying or unlawful (this is true despite Wells and Dock Street knowing that the Brokers were bidding on behalf of third parties) or that their bids had been rejected. Ghei Affidavit, ¶14. Instead, Wells and Dock Street simply said that the HoldCo Entities' bids did not meet reserves, and Wells cannot now argue the contrary. *Id.*

Wells to reject non-qualifying or unlawful bids would be rendered meaningless if Section 3(a) simply allowed Wells to reject any bid for any reason in its sole and absolute discretion.

**Ninth,** the cases cited by Wells to prove that Section 3(a) constitutes a reservation of rights are illustrative instead of the fact that Section 3(a) is *not* the type of reservation required by the case law. For example, in *Truman Capital Advisors LP v. Nationstar Mortgage LLC*, the bid procedures stated (i) "This is a reserve auction and all Notes have a reserve price;" (ii) "In order to become the Winning Bidder for a Note, a Bidder must meet or exceed the Reserve Price and the bid must be accepted by the Seller;" and (iii) "To purchase a particular note. . . one must be acknowledged by the Auctioneer as the Winning Bidder." 2014 U.S. Dist. LEXIS 118246, at *8-9, 12 (S.D.N.Y. Aug. 25, 2014). Similarly, the bid procedures in *Lawrence Paper* provided: (i) "THIS SALE SUBJECT TO COURT CONFIRMATION" and (ii) "Be advised any and all sales are subject to confirmation by the Secured Party" and the auctioneer in Lawrence Paper further "stated unequivocally at the beginning of the bidding that the sales were subject to confirmation by the secured party." *Lawrence Paper*, 939 F.3d at 377, 379. And in *Ferry v. Udall*, the bid procedures stated "[U]ntil the issuance of a cash certificate, the authorized officer may at any time determine that the lands should not be sold. . . the bidder has no contractual or other rights. . . and no action taken will create any contractual or other obligation. . . ."). 336 F.2d 706, 709 (9th Cir. 1964). These cases apply to auctions that are categorically different from the January Auction, and the language found in such cases is thus categorically different from Section 3(a). Section 3(a) simply provides that Wells can adjourn a "Sale" (like the January Auction); it does not say that bids are "subject to confirmation" like *Lawrence* Paper or that bids "must be accepted by the Seller" like *Truman*. It only provides Wells the unremarkable right to elect not to go forward with the January Auction.

**Tenth,** if the definition of "Sale" is determined by the Court to be ambiguous, however, New York law is clear that the ambiguity must be construed against Wells, as the drafter of the November Notices, and in favor of the HoldCo Entities. *See, e.g., Albany*, 117 F.3d at 674; *Jacobson*, 66 N.Y.2d at 993, 499 N.Y.S.2d at 382 ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.").

## IV.    Wells Failure to Address the Custom and Practice in the Industry Requires the Denial of the Wells MSJ

The January Auction was not unique. In the aftermath of the financial crisis, hundreds of CDOs with trustees such as Wells suffered significant losses, resulting in events of default allowing certain noteholders to direct the trustee to liquidate the CDOs collateral in one of more auctions. These types of auctions – driven by defaults of CDOs - are commonly referred to in the industry as "CDO liquidations" and a well-established marketplace exists. Market participants expect that collateral being auctioned in CDO liquidations will be sold to the highest qualified bidder on the date of the auction *without* reservation. The only way to overcome this presumption is for a seller to prominently convey that a specific CDO liquidation would be handled differently than the expected norm. This market expectation is consistent with Wells' actual historical practice in 38 CDO liquidations that it conducted since the financial crisis. In those 38 CDO liquidations, publicly available information demonstrates that 99.9% of the 3,853 items of collateral auctioned in CDO liquidations were actually sold to the highest qualified bidder on the auction date. Veltman Affidavit, ¶23.

Similarly, the November Notices were not unique. Instead, with a few clarifying changes, they were documents commonly used throughout the CDO liquidation industry and were substantially similar to the bid procedures used by Wells in the dozens of other CDO liquidations

it conducted since the financial crisis of 2008. When Wells wanted to preserve its right to set reserve levels, or provide for credit bidding by noteholders, it would utilize bid procedures that expressly disclosed the possibility of either. *Id.*, ¶¶24-25. In 38 liquidations conducted by Wells, 19 of the 38 explicitly stated that "reserve levels may apply" and 8 explicitly stated that senior noteholders may credit bid. *Id.*, ¶25. These disclosures were notably absent in other form bid procedures used by Wells, such as the November Notices, which also had objective language stating that collateral would simply trade to the highest qualified bidder. The existence of these two different Wells CDO liquidation form notices – one which preserved the right to set reserves, and one which did not – established a presumption that utilization of the latter form document was a certain precursor to an absolute auction where all collateral would trade to the highest qualified bidder.

Market participants, in the first instance, therefore presume that all items being sold in a CDO liquidation will trade – an expectation which is consistent with Wells' historical practice as trustee of dozens of CDO liquidations – and, in the second instance, that reserves (whether through general reservation language, reserve levels or the right to credit bid) will be disclosed by the liquidating party if there is even the slightest chance that an item will not trade. *Id.* As a result of this industry practice and understanding, if the merest possibility of a reserve applies – or in certain circumstances the right to credit bid – Wells employs language in its auction notices that clearly discloses to the market that the auction is with reserve or is subject to a credit bid. This reserve language is notably absent from the November Notices.

This industry custom and practice is evidenced by the Veltman Affidavit. Ms. Veltman has spent the majority of her career in the CDO market and has substantial experience with CDO liquidations. After graduating from the Wharton School of Business in 2003, Ms. Veltman spent

eleven years working in structured finance. Throughout her career she has worked at Merrill Lynch, as Managing Director and Co-Head of Trading at Cohen & Company and as a Senior Vice President at Raymond James. *Id.*, ¶¶4-11. During these years, Ms. Veltman was actively involved in evaluating, analyzing, and participating in CDO liquidations and marketing, selling, and facilitating trades in various structured product securities for clients. Ms. Veltman also had substantial involvement in many CDO liquidations, both from a trade execution and a client advisory standpoint.

In the Veltman Affidavit, Ms. Veltman opines that market participants would have assumed that collateral in the January Auction would have traded to the highest bidder without reservation. Specifically, Ms. Veltman states:

> "***[T]he expectation of market participants, as well as the actual trading practice in EOD CDO liquidations on which Wells Fargo was trustee, is that all collateral trades to the highest qualified bidder on the auction date. In absence of express language to the contrary, Soloso 2005-1 bidders would expect all collateral to sell to the highest qualified bidder on the respective auction date.*** In reviewing Soloso 2005-1 CDO's Notices of Sale and Disposition, I found that no such language existed, even though Wells Fargo frequently included this language in other CDO EOD liquidation auction Notices of Sale. ***As a result, based on market expectations, actual historical practice and the auction notices themselves, I believe that market participants would have expected that the collateral in Soloso 2005-1's auctions (particularly the auction notices that did not have language regarding reserve levels applying) would have traded to the highest qualified bidder on the auction date.***"

*Id.*, ¶27 (emphasis added).

To arrive at her conclusions, Ms. Veltman utilized her extensive experience with CDO liquidations and her knowledge of the market practice and expectation with respect to CDO liquidations, such as the January Auction. Ms. Veltman also analyzed the general disclosures that Wells' uses in these types of auctions and provides her analysis of 38 auction notices and

procedures used by Wells since 2008.[9] Her analysis shows that o***f those 38 notices and procedures, half had explicit disclosures that "reserves may apply."*** *Id.*, ¶25.

Ms. Veltman's analysis of Wells' public trustee reports following a CDO liquidation also confirms her – and the market's understanding – that bidders in CDO liquidations expect that all collateral will trade to the highest bidder without reservation. Her analysis demonstrated that ***99.9% the 3,853 items of collateral auctioned in these 38 auctions in fact traded to the highest bidder on the auction dat****e, regardless of whether the notices and bid procedures disclosed reserves.***[10] *Id.*, ¶23. Consequently, the Veltman Affidavit supports the reality of CDO liquidations: industry participants expect all items to trade – and indeed, they historically always have - and that if there is even a small chance that reserves may apply, they must be prominently disclosed to counteract this presumption.[11]

Ms. Veltman's analysis also shows that, there are generally two subsets of notices. The first is substantially similar to the November Notices and does not disclose that reserve levels may apply or otherwise reserve discretion in the trustee to accept bids. The second is the opposite and has language disclosing that reserve levels may apply and/or reserving discretion in the trustee to accept bids. A sampling of the operative language from each of the "without

---

[9] Copies of each of these auction notices and procedures are attached to the Ghei Affidavit, which is being filed concurrently herewith, as Exhibit E through Exhibit H and as Exhibit 1A through 40B to Exhibit 2 to the Veltman Affidavit. As disclosed in the Ghei Affidavit, this selection of notices is not exhaustive. There are other Wells' notices, but Wells requires a party to agree to certain confidentiality restrictions to access these notices, which may prohibit the disclosure of these documents. To the extent that they are relevant, the HoldCo Entities will request them in discovery.

[10] Ms. Veltman does disclose that there were three items of collateral – out of 3,853 total items – that appear to have traded after the specified auction date. *Id.*, ¶23. Ms. Veltman opines that this could have been for a number of reasons, including that these items of collateral did not get bids, got pulled from the list of collateral for sale prior to the time of the auction, or had settlement issues with the initial buyer on the date of the auction. *Id.*

[11] This understanding was conveyed by Guggenheim – the most active broker-dealer, on behalf of clients in the first Sale (Ex. S) – to its clients in at least two emails dated November 30, 2015, and December 4, 2015, which provided: (i) "These bonds will trade as this is a LIQUIDATION, not an AUCTION CALL;" and (ii) "[A]s we've mentioned before, this is a liquidation, not an auction call, so bonds will trade, and given the state of the markets there will likely be some good buy opportunities here." *See* Ex. P.

reserve" and "with reserve" subsets is included below and is furthered developed in Ms. Veltman's expert report. Ex. 2. Section (a) includes language from the initial announcements of the CDO liquidation, which serve the same purpose as the November Announcement. Section (b) includes the operative language from the bid procedures, which serve substantially the same purpose as the November Procedures.

### a. Initial Announcements

**November Notice (without reserve):** "We will sell the property described on <u>Exhibit A</u> attached hereto (the '<u>Collateral</u>') to the highest qualified bidder or bidders in five public sales as set forth below (the '<u>Sales</u>')." (page 1.)

***With* Reserve Auction:**[12] "We will sell the property described on <u>Exhibit A</u> attached hereto (the '<u>Collateral</u>') to the highest qualified bidder or bidders (*subject to a reserve level, if any*) in one or more public sales as set forth below (the '<u>Sale</u>')" (page 1 (emphasis added))

### b. Bid Procedures

**November Procedures (without reserve):**

- "You are officially invited to bid on the collateral described below (the 'Collateral'), which will be sold at sales, as indicated below (the 'Sales')." (page 1)

- "Each item of Collateral will be awarded only to the best bidder who is also a qualified bidder (the 'Best Bidder')." (Section 3(a))

- "The winning bids shall be determined as follows:" (Section 3(c))

- "the winning bid for each item of Collateral shall be the highest qualified bid for each such item of Collateral." (Section 3(c)(ii))

- "The terms of the Sales shall be: The Best Bidder shall provide payment of funds in cash or by certified or cashier's check or wire transfer. Unless otherwise specified, the Sale of each security will settle not later than on a T+3 basis (the 'Settlement Date')." (Section 3(o))

***With* Reserve Auction:**

- "You are officially invited to bid on the collateral described below (the 'Collateral'), which will be sold individually or on a portfolio basis at three sales, as indicated below (collectively, the 'Sale')." (page 1)

- "Bids for the Collateral (individually or on a portfolio basis) will be awarded only to the best bidder who is also a qualified bidder (the 'Best Bidder')." (Section 3(a))

---

[12] The forms used as an example of an auction "with" reserve is Ridgeway Court Funding II, Ltd. Ex. 2.

- "***Reserve levels may apply***." (Section 3(l)) (emphasis added)

- ***The winning bids shall be determined by the Trustee*** as follows:" (Section 3(m))

- "the winning bid for each Cash Asset shall be the highest qualified bid for each such Cash ***Asset.. . . If a reserve bid has been submitted for a Cash Asset or a Portfolio and no bid from a qualified bidder exceeds the reserve bid for such Cash Asset or Portfolio, as applicable, then the reserve bid shall be considered the winning bid for such Cash Asset or Portfolio.***" (Section 3(m)(ii))

- "The terms of the Sale of any Cash Asset or Portfolio shall be payment of funds in cash or by certified or cashier's check or wire transfer ***after the acceptance of any bid***." (Section 3(q)) (emphasis added)

*Id.*

When the notices are viewed as a whole, it is clear that Wells' practice and the custom in the industry is to disclose – using the generalized language set forth above – that reserve limits or any other type of reserve may apply if it intends an auction to be with reserve. *Id.*, ¶24. And even when Wells does preserve this right, Ms. Veltman's analysis confirmed that 99.9% of collateral in Wells' prior CDO liquidations traded to the highest qualified bidder. *Id.* Wells' understanding of this industry practice and the need to properly disclose reserves is further evidenced by the April Procedures. The April Procedures used the same generalized language that Wells included in its prior forms for *with* reserve auctions to disclose the possibility of reserve levels by stating: "Reserve levels may apply." Ex. L, §3(a).

It is also clear that market participants were entitled to rely on the terms of the various forms to determine which type of auction Wells was running, especially because of the industry-wide understanding that in CDO liquidations *all* items trade. Consequently, by using its *without* reserve form for the January Auction, Wells clearly and unequivocally signaled to the market its intent to sell the Collateral *without* reserve and therefore created an auction *without* reserve.

21

## V.     Assuming Arguendo that the January Auction was "with reserve", Wells Failed to Actually Set Reserves

Because the November Notices and the custom and practice of CDO liquidations unambiguously established an absolute auction, whether Wells set reserve levels prior to the January Auction is irrelevant in determining whether the January Auction was with or without reserve. After all, whether "reserve levels" were allowed is a function of whether the January Auction was with or without reserve (which it was), not whether Wells set reserve levels. *Drew*, 19 A.D.2d at 310, 241 N.Y.S.2d at 269

However, assuming, *arguendo*, that the January Auction was with reserve, Wells still failed to set reserves. Dock Street admitted that it did not receive direction from Wells to set reserves. Crowle Affidavit, Ex. E [Docket No. 27.5]. Dock Street further admitted that it had no authority to set reserves without Wells' direction. Further, the only evidence of reserves being set is an email "proposal" from Mr. Bley of Och-Ziff Capital Management LLC, a holder of Soloso notes ("Och-Ziff"), to Wells' attorney. There is no evidence at all showing that Wells accepted or adopted Och-Ziff's "proposal;" that Wells directed Dock Street to set reserves; or even that the "proposal" was conveyed to Wells by its counsel. Indeed, based on the evidence submitted by Wells, Wells did not set reserves or direct Dock Street to set reserves. Consequently, no reserves were set. *See* 7 Am. Jur. 2d Auctions and Auctioneers, §25 (stating that an auctioneer may undertake reserve bids on behalf of the seller in an auction with reserve if such reserve bids are received "before the auction").

## VI.     Wells' Does Not Have Standing to Seek Relief on Behalf of Third Parties

In the Wells MSJ, Wells seeks an order exculpating non-parties Soloso, Lansuppe Feeder Fund LLC, Dock Street and each of their respective agents and affiliates. The HoldCo Entities have asserted as their affirmative defense based on Rule 12(b)(7) of the Federal Rules of Civil

Procedure based on Wells failure to add these parties to this action, and Wells request for summary judgment on behalf of non-parties is just as improper here. Wells lacks the standing to seek relief for third parties. If such parties wanted or believed that they were entitled to the relief Wells' requests, they could have been joined to this case by Wells pursuant to Federal Rule of Civil Procedure 19 or could have joined this case themselves pursuant to Federal Rule of Civil Procedure 20. They have, however, elected to do neither and to assert their claims through a proxy – Wells – which has proffered no evidence that it has standing, whether direct or associational, to assert the rights of unrelated third parties. *See, e.g., Hunt v. Wash. State Apple Adver. Comm'n.*, 432 U.S. 333, 343 (1977). Consequently, Wells' request for relief on behalf of non-parties should be denied.

<u>**CONCLUSION**</u>

Because the November Notices and the custom and usage of the CDO liquidation market established an absolute auction, the submission of a highest qualifying bid for an item of collateral being sold in the January Auction created a contract between Wells and the highest qualifying bidder. Because HoldCo II and Opps II were the highest qualifying bidders on the Subject Collateral, they are contractually entitled to delivery of the Subject Collateral (plus any proceeds received thereon since the January Auction) at the price they bid in the January Auction. Consequently, the Wells MSJ should be denied in all respects.

For the foregoing reasons, the HoldCo Entities respectfully request that the Court enter an order denying the Wells MSJ in all respects and granting such other relief as the Court may deem just and proper.

Dated:  New York, New York
       October 11, 2016                 Respectfully Submitted,

**LEPORE & ASSOCIATES, P.C.**

*Lauren B. Lepore*

Lauren B. Lepore (LL-0772)
200 Park Avenue, 17th Floor
New York, New York 10166
Phone: (646) 632-3786
Email: llepore@leporelawfirm.com

-and-

**JEFFREY D. STERNKLAR LLC**
Jeffrey D. Sternklar
225 Franklin Street, 26th Floor
Boston, Massachusetts 02110
T: (617) 396-4515

*Attorneys for Defendants/Counterclaim Plaintiffs
Holdco Asset Management, L.P.; HoldCo
Opportunities Fund II, L.P. and Opportunities II
Ltd.*

24