UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

WELLS FARGO BANK, N.A., *solely in its*
*capacity as trustee for Soloso CDO 2005-1 Ltd.*,

      Plaintiff,

  -v-

HOLDCO ASSET MANAGEMENT, L.P.;
HOLDCO OPPORTUNITIES FUND II, L.P.;
and
OPPORTUNITIES II LTD.,

      Defendant.

--------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 11, 2017

16-cv-6356 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

  This is a contract dispute arising from an auction conducted by Wells Fargo Bank, N.A. ("Wells Fargo") on January 21, 2016 (the "January Auction") to liquidate the assets of Soloso CDO 2005-1 Ltd. and Soloso CDO 2005-1 Corp. (collectively, "Soloso"), a collateralized debt obligation ("CDO") of which Wells Fargo serves as the trustee. The parties disagree about who owns three securities that Wells Fargo noticed for auction. HoldCo Asset Management, L.P., HoldCo Opportunities Fund II, L.P., and Opportunities II Ltd. (collectively, "HoldCo") claim they own the securities because they submitted the highest qualifying bids on these assets in the January Auction. In HoldCo's view, Wells Fargo conducted the auction "without reserve," which means it did not reserve the right to reject qualifying bids, and Wells Fargo's failure to deliver the securities constitutes a breach of contract.

Wells Fargo counters that Soloso still owns the securities because Wells Fargo conducted the auction "with reserve," which means it reserved the right not to accept, and in fact did not accept, HoldCo's bids.

The parties have filed several motions in an attempt to resolve this ownership issue and pursue associated remedies. Now before the Court are Wells Fargo and HoldCo's cross-motions for summary judgment (ECF Nos. 24 and 46, respectively), Wells Fargo's motion to dismiss HoldCo's counterclaims (ECF No. 53) and HoldCo's motion for discovery pursuant to Federal Rule of Civil Procedure 56(d) (ECF No. 74).

For the reasons set forth below, the Court GRANTS Wells Fargo's motion for summary judgment, DENIES HoldCo's motions for summary judgment and relief pursuant to Rule 56(d) and GRANTS in part and DENIES in part Wells Fargo's motion to dismiss under Rule 12(b)(6). The Court further DISMISSES as moot Counts One, Two and Three of HoldCo's counterclaims. (See ECF No. 38.)

I.    FACTUAL BACKGROUND

The facts below are drawn from the undisputed facts in the record. This case arises from an auction that Wells Fargo, as trustee of the Soloso CDO, conducted after being directed by court order to liquidate trust assets owned by Soloso. The subsections below first describe the trust instruction proceeding that led Wells Fargo to conduct the auction at issue in this case, then discuss the notice and invitation to bid that Wells Fargo issued in advance of the auction, and, finally, describe the events that unfolded during the auction itself.

A.    The Trust Instruction Proceeding

On September 8, 2015, Lansuppe Feeder, LLC ("Lansuppe"), a noteholder in

Soloso, commenced a trust instruction proceeding in this District against Wells

Fargo.  (The Trustee's Statement of Undisputed Material Facts Pursuant to Local

Civil Rule 56.1 in Support of the Trustee's Motion for Summary Judgment ("Pl.'s

56.1"), ECF No. 28 ¶ 1; see also Affidavit of Charles Brehm in Support of Trustee's

Motion for Summary Judgment ("Brehm Aff."), ECF No. 26, Ex. 2.)  That action is

captioned Lansuppe Feeder, LLC v. Wells Fargo Bank, N.A., No. 15-cv-7034

(S.D.N.Y.), and proceeded before the Honorable Laura Taylor Swain.  (See Brehm

Aff., Ex. 2.)  In that proceeding, Lansuppe alleged that in April 2013, Soloso

defaulted on its obligations under the Soloso indenture (the "Indenture") when it

failed to pay interest owed to Class A-1 noteholders.  (Pl.'s 56.1 ¶ 2; Brehm Aff., Ex.

2 ¶ 2.)  Lansuppe further alleged that, as the holder of more than two-thirds of

Class A-1 notes issued by Soloso, it had a right, which it exercised to direct Wells

Fargo to liquidate the collateral held by Soloso.  (Pl.'s 56.1 ¶ 2; Brehm Aff., Ex. 2 ¶¶

2, 28-30.)  Lansuppe sought a judicial instruction compelling Wells Fargo to comply

with its liquidation directive.  (Pl.'s 56.1 ¶ 2; Brehm Aff., Ex. 2 ¶ 55.)

The Indenture sets forth the process Wells Fargo must follow in the event an

eligible noteholder directs liquidation.  Section 5.4 provides, in relevant part:

> If the applicable Noteholders direct any sale or liquidation of the Trust
> Estate, or any portion thereof, the Trustee shall sell or liquidate the Trust
> Estate, or portion thereof, in accordance with Section 5.18 at one or more
> public or private sales conducted in any manner permitted by law.

(Pl.'s 56.1 ¶ 3; Brehm Aff., Ex. 1 § 5.4.)  Section 5.18 provides, in relevant part:

The power to effect any sale (a 'Sale') of any portion of the Trust Estate pursuant to Section 5.4 and Section 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate securing the Notes shall have been sold . . .

(Pl.'s 56.1 ¶ 4; Brehm Aff., Ex. 1 § 5.18(a).)

On October 26, 2015, Judge Swain issued a Memorandum Opinion & Order granting partial summary judgment in favor of Lansuppe (the "Liquidation Order"), which stated, in relevant part:

Lansuppe's motion for summary judgment is granted insofar as it seeks an instruction from this Court that the Trustee liquidate the assets of the Trust Estate. The Trustee is hereby authorized and directed to liquidate the assets of the Trust Estate in accordance with the provisions of the Indenture. Such assets are to be held, pending further order of the Court, in a manner designed to preserve their value. The Trustee shall not be held liable to any Noteholder or other third party for any actions taken in compliance with this Memorandum Opinion and Order.

(Pl.'s 56.1 ¶ 5; Brehm Aff., Ex. 3 at 12.)[1]

B.    The Liquidation Process

Pursuant to the Indenture and Liquidation Order, on November 18, 2015, the

---

[1] On September 29, 2016, Judge Swain issued a Memorandum Opinion and Order granting summary judgment in Lansuppe's favor on the remaining aspects of Lansuppe's motion, denying the cross-motion for summary judgment submitted by Oxford University Bank, Citizens Bank & Trust Company, Coastal Commerce Bank, Guaranty Bank and Trust Company, Bankfirst Financial Services, The First—a National Banking Association, Copiah Bank National Association, PriorityOne Bank, Bank of Morton, Bank of Kilmichael, Holmes County Bank and Trust Company, First Commercial Bank and First State Bank (collectively, the "Intervenors") and directing the Intervenors to show cause by written submission as to why their remaining cross-claims should not be dismissed in light of the September 29, 2016 Order. See Lansuppe Feeder, LLC v. Wells Fargo Bank, N.A., No. 15-CV-7034, 2016 WL 5477741, at *6 (S.D.N.Y. Sept. 29, 2016). On November 28, 2016, Judge Swain issued an order declining the Intervenors' request for reconsideration of the September 29, 2016 Order, dismissing the Intervenors' cross-claims and directing the Clerk of Court to close the case. Lansuppe Feeder, No. 15-CV-7034-LTS (S.D.N.Y. Nov. 28, 2016), ECF No. 149. The Intervenors filed a notice of appeal on December 2, 2016. Notice of Appeal, Lansuppe Feeder, No. 15-CV-7034-LTS (S.D.N.Y. Dec. 2, 2016), ECF No. 151.

Trustee issued a Notification of Public Disposition of Collateral (the "Notice") to Soloso and its noteholders, among others, stating that Wells Fargo would sell Soloso's assets "to the highest qualified bidder or bidders in five public sales," which the Notice defined as the "Sales." (Brehm Aff., Ex. 4 at 2; see also Pl.'s 56.1 ¶ 7; The HoldCo Entities' Corrected Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of the HoldCo Entities' Motion for Summary Judgment ("Def.'s 56.1"), ECF No. 78 ¶¶ 3, 6.) The Notice lists the dates of the five public auctions, defined as the "Sales", and discloses that Wells Fargo had retained Dock Street Capital Management LLC ("Dock Street") to serve as the liquidation agent. (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶¶ 5, 7; Brehm Aff., Ex. 4 at 2.) It further provides that "[a]ny Collateral remaining unsold at the conclusion of the public Sales referenced above may be sold in one or more public or private sales on or after the date of Public Sale No. 5." (Brehm Aff., Ex. 4 at 3.)

Also pursuant to the Indenture and Liquidation Order, on November 20, 2015, Wells Fargo issued a Notice of Public Sale and Invitation to Bid ("Invitation to Bid") to potential bidders and other parties. (Pl.'s 56.1 ¶ 9; Def.'s 56.1 ¶ 8; Brehm Aff., Ex. 5.) The Invitation to Bid provides, "You are officially invited to bid on the collateral described below (the 'Collateral'), which will be sold at sales, as indicated below (the 'Sales')." (Brehm Aff., Ex. 5 at 2; see also Pl.'s 56.1 ¶ 10; Def.'s 56.1 ¶ 10.) The Invitation to Bid identifies the assets to be sold and informs participants that the collateral will be sold in five separate auctions throughout December 2015 and January 2016 at specified dates and times (identified as "Sales"). (Pl.'s 56.1 ¶ 11;

Def.'s 56.1 ¶¶ 10-11; Brehm Aff., Ex. 5.)  The Invitation to Bid informs potential

bidders that, "[b]y submitting a bid, the bidder agrees to be bound by the terms and

conditions, representations and warranties of this [document]."  (Brehm Aff., Ex. 5 §

3(i); Pl.'s 56.1 ¶ 12.)

Section 3 of the Invitation to Bid sets forth several "Conditions of Sales," only

some of which are pertinent here.  (See Brehm Aff., Ex. 5 § 3.)

Section 3(a) provides:

Each item of Collateral will be awarded only to the best bidder who is also a
qualified bidder (the "Best Bidder").  The Trustee reserves the right to reject
any bid which it deems to have been made by a bidder which is unable to
satisfy the requirements imposed by the Trustee upon prospective bidders in
connection with the Sales or to whom in the Trustee's sole judgment a Sale
may not lawfully be made.  The Trustee shall not be obligated to make any
Sale and reserves the right to sell all or a part of the Collateral at a
subsequent public or private Sale.

(Brehm Aff., Ex. 5 § 3(a); see also Pl.'s 56.1 ¶ 13; Def.'s 56.1 ¶ 12.)

Section 3(c) provides:

The winning bids shall be determined as follows:

(i)  if (A) one or more qualified bids is submitted for a Portfolio and (B)
the highest qualified bid for such Portfolio is greater than the sum of
the highest qualified bids with respect to each of the items of Collateral
included in such Portfolio, the winning bid with respect to each of the
items of Collateral included in such Portfolio shall be such highest
qualified bid for such Portfolio; and

(ii) otherwise, the winning bid for each item of Collateral shall be the
highest qualified bid for each such item of Collateral.

(Brehm Aff., Ex. 5 § 3(c); Def.'s 56.1 ¶ 13.)

Section 3(g) provides, in relevant part, "The Trustee will accept bids only

from such of those persons to whom in its sole judgment a Sale may lawfully be

made." (Brehm Aff., Ex. 5 § 3(g).) Section 3(k) provides, "All bids submitted must be irrevocable and unconditional and held open for no less than three (3) hours." (Id. § 3(k); see also id. § 3(n) ("All bids submitted must be irrevocable and unconditional.").)

Section 3(o) provides, in relevant part, "Unless otherwise specified, the Sale of each security will settle not later than on a T+3 basis (the 'Settlement Date')." (Brehm Aff., Ex. 5 § 3(o); Def.'s 56.1 ¶ 14.)

Section 3(q) provides:

The Trustee reserves the right to offer the Collateral in any other commercially reasonable manner. The Trustee may adjourn or cancel the Sales or cause such Sales to be adjourned, recessed and/or reconvened from time to time, without further written notice or further publicity, by announcement at the time and place appointed for such Sales or at any adjournment, recess and/or reconvening and, without further written notice or publication, such Sales may be held at the time and place to which they may have been so adjourned.

(Brehm Aff., Ex. 5 § 3(q).)

Section 3(r) provides:

No Sale will be completed until the Best Bidder completes its purchase as provided herein and, in the case of any failure to complete a purchase, the Trustee may without further notice accept the next best bid from a qualified bidder.

(Brehm Aff., Ex. § 3(r).)

Neither the Invitation to Bid nor the Notice explicitly provides that "reserve levels may apply," "reserve levels shall apply," or "reserve levels will apply." (Def. 56.1 ¶ 15.)

C.     The January Auction

On January 21, 2016, the fourth of the five scheduled Sales was held (the "January Auction").  (Pl.'s 56.1 ¶ 20; Def.'s 56.1 ¶ 23.)  This action concerns three of the securities listed for sale in the January Auction: (1) $15,000,000 in original principal amount of trust preferred securities issued by MB Financial Capital Trust II (the "MB Asset"); (2) $10,000,000 in original principal amount of trust preferred securities issued by Arrow Capital Statutory Trust III (the "Arrow Asset"); and (3) $10,000,000 in original principal amount of trust preferred securities issued by SWBT Statutory Trust II (the "SWBT Asset") (collectively, the "Subject Securities"). (Pl.'s 56.1 ¶ 20; see also Brehm Aff., Ex. 5 at Ex. B-4; Brehm Aff., Ex. 4 at Ex. A.)

Before the January Action, a HoldCo entity approached Sandler O'Neill & Partners, L.P. ("Sandler") and Guggenheim Securities LLC ("Guggenheim") to represent them in the Sales.[2]  (Def.'s 56.1 ¶ 19; Trustee's Response to HoldCo's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of HoldCo's Cross-Motion for Summary Judgment ("Pl. Counter Statement"), ECF No. 58 ¶ 19.)  Guggenheim and Sandler submitted the following bids relating to the Subject Securities to Dock Street:

---

[2] Wells Fargo concedes that a HoldCo entity approached Guggenheim and Sandler "concerning the Sales," but disputes that the "HoldCo Entities" approached Guggenheim and Sandler.  (Pl.'s Counter Statement ¶ 19.)  In the memorandum of law supporting its motion for summary judgment, Wells Fargo reserved its rights and remedies relating to bids allegedly made for or on behalf of HoldCo, but stated that "these arguments are neither raised in nor relevant to [its] present motion" for summary judgment.  (ECF No. 25 at 1 n.1.)  Accordingly, the Court treats the fact that HoldCo approached Sandler and Guggenheim to represent them in the January Auction as undisputed for the purposes of the present motion.

| Security | Guggenheim Bid Price (as a % of the notional value of the security) | Sandler Bid Price (as a % of the notional value of the security) |
| --- | --- | --- |
| MB Asset | 30.50 | 40.52 |
| Arrow Asset | 41.53 | 37.55 |
| SWBT Asset | 43.48 | 40.10 |

(Pl.'s 56.1 ¶ 21; see also Def.'s 56.1 ¶ 27.)

After the period allotted for bidding closed, Dock Street informed Wells Fargo's counsel that the Subject Securities "didn't meet reserves and we're [sic] not traded." (Affidavit of David Crowle in Support of the Trustee's Motion for Summary Judgment, dated September 21, 2016 ("Crowle Aff."), ECF No. 27, Ex. E.) Dock Street also exchanged instant chat messages with Guggenheim on the afternoon of January 21, 2016, in which Dock Street explained that the some of the securities were "DNTs" (i.e., did not trade) because they "didn't meet reserves." (Id., Ex. F at 12:18 PM – 12:33 PM; see also id. ¶ 11.) In response to inquiries from Guggenheim, Dock Street told Guggenheim that it had placed the high bid on two of the DNTs, lots 1 and 12 (id., Ex. F at 1:31 PM – 2:43 PM), which corresponded to the Arrow Asset and the SWBT Asset, respectively (Pl.'s 56.1 ¶ 27). Sandler also asked Dock Street whether it had been "high" on any of the securities that "dnt'd." (Crowle Aff., Ex. G at 1:49 PM; see also Pl.'s 56.1 ¶ 28.) Dock Street stated that Sandler had submitted the high bids on lots 6 and 7 (Crowle Aff., Ex. G at 1:50 PM), with lot 7 corresponding to the MB Asset (Pl.'s 56.1 ¶ 29).

## II. PROCEDURAL HISTORY

Wells Fargo commenced this action against HoldCo on August 10, 2016, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of

Civil Procedure 57 that (1) no contract for sale of any of the Subject Securities was formed as a result of the January Auction; (2) HoldCo has no right or interest in the Subject Securities; and (3) HoldCo has no cause of action against Soloso, Wells Fargo, Lansuppe, Dock Street or any of their respective agents or affiliates in connection with the January Auction or the Subject Securities.  (ECF No. 1 at 10-11.)

On September 22, 2016, Wells Fargo moved for summary judgment on its declaratory judgment claim.  (ECF No. 24.)  On September 30, 2016, HoldCo filed its answer to the complaint.  (ECF No. 38.)  HoldCo raised several affirmative defenses not relevant here.  (See id. at 7-9.)  HoldCo also asserted seven counterclaims against Wells Fargo.  (Id. at ¶¶ 137-185.)  In particular, Wells Fargo sought declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that (1) the Auction "was an 'absolute auction' without reserve by its express terms and, in the alternative, under the usage of trade in the industry"; (2) HoldCo was the "Best Bidder" and the winning bidder; (3) HoldCo's bids created an enforceable contract for sale of the Subject Securities; and (4) HoldCo is contractually entitled to delivery of the Subject Securities and any proceeds thereon since the January Auction.  (Id. ¶¶ 141; see also ¶¶ 137-40, 142.)  HoldCo also asserted counterclaims for breach of contract, specific performance, conversion, replevin, breach of the duty to conduct a fair auction under New York law and negligent misrepresentation under New York law.  (Id. ¶¶ 143-85.)

On October 11, 2016, HoldCo cross-moved for partial summary judgment on its counterclaims for declaratory judgment, breach of contract and specific performance. (ECF No. 46.) On October 24, 2016, Wells Fargo moved to dismiss with prejudice and/or to strike HoldCo's counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f). (ECF No. 53.) The Court granted Wells Fargo's request to stay discovery pending resolution of the instant dispositive motions on November 1, 2016. (ECF No. 64.) Two weeks later, on November 15, 2016, HoldCo moved pursuant to Federal Rule of Civil Procedure 56(d) for leave to conduct discovery into the notices used by CDO trustees other than Wells Fargo in CDO liquidations. (ECF No. 74; see also ECF No. 75 (describing specific discovery sought).)

III. DISCUSSION

A. Cross-Motions for Summary Judgment

The Court focuses first on the parties' dueling summary judgment motions, as resolving those motions settles the parties' core claims. Wells Fargo and HoldCo seek opposing judicial declarations regarding the proper disposition of the Subject Securities. Wells Fargo, for its part, seeks a declaration that HoldCo has no interest in the Subject Securities. (ECF No. 25 at 7-10.) HoldCo, in turn, seeks a declaration that it owns the Subject Securities and is entitled to their delivery. (ECF No. 47 at 13-15, 26.) For the reasons set forth below, the Court GRANTS Wells Fargo's motion for summary judgment on each of its claims and DENIES

HoldCo's motion on its counterclaims for declaratory judgment, breach of contract and specific performance.

1.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, determining the rightful owner of the Subject Securities requires the Court to interpret the Invitation to Bid and Notice, which set forth the terms and conditions of the January Auction. (<u>See</u> Pl. 56.1 ¶ 12.) Both parties submit that all relevant contractual provisions are unambiguous, though they read the documents to reach opposite results. (<u>Compare</u> ECF No. 25 at 10 (arguing Wells Fargo is entitled to keep the Subject Securities under the Invitation to Bid), <u>with</u> ECF No. 47 at 15 (arguing HoldCo is entitled to the Subject Securities under the Invitation to Bid and Notice). If, as the parties assert, the Invitation to Bid and Notice are unambiguous, then "[t]he proper interpretation . . . is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." <u>Omni Quartz, Ltd. v. CVS Corp.</u>, 287 F.3d 61, 64 (2d Cir. 2002) (citation omitted). Ambiguous contracts, by contrast, may be resolved on summary judgment "if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." <u>Topps Co. v. Cadbury Stani S.A.I.C.</u>, 526 F.3d 63, 68 (2d Cir. 2008).

Under New York law, contractual language is ambiguous when "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." See Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011). Extrinsic and parol evidence may not be admitted "to create an ambiguity in a written agreement which is clear and unambiguous upon its face." Intercontinental Planning, Ltd. v. Daystrom, Inc., 248 N.E.2d 576, 580 (N.Y. 1969). However, the Court may not ignore context and custom in interpreting an agreement, see Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005), and "[e]vidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance," Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 180 (2d Cir. 2014). Indeed, "[t]erms that have an apparently unambiguous meaning to lay persons may in fact have a specialized meaning in a particular industry." Id.

2.    Auction Law

Determining which party is properly entitled to the Subject Securities depends entirely on the type of auction that took place. In making this assessment, the Court is bound by New York law.[3]   New York case law on auctions is not expansive and tends to reference suprajurisdictional sources, such as the

---

[3] Both the Investor Representations Agreement executed by Guggenheim and Sandler and the Indenture authorizing the auction contain New York choice-of-law provisions. (Brehm Aff., Ex. 5, Ex. A ¶ 8 ("This [Investor Representations and Confidentiality] Agreement shall be governed by and construed in accordance with the laws of the State of New York."); Brehm Aff., Ex. 1 § 13.10 ("This Indenture . . . shall be construed in accordance with and governed by the laws of the State of New York applicable to agreements made and to be performed therein.").)

Restatement of Contracts, Corbin on Contracts, and American Jurisprudence.  See, e.g., Drew v. John Deere Co. of Syracuse, 241 N.Y.S.2d 267, 269-70 (App. Div. 1963) (referencing Restatement and treatises); Slukina v. 409 Edgecombe Ave. Hous. Dev. Fund Corp., No. 154213/2012, 2013 WL 4446914, at *4-5 (N.Y. Sup. Ct. Aug. 16, 2013) (same).  Such resources are therefore useful, to the extent they discuss core tenets of auction law across jurisdictions or clarify decisions issued by New York courts.  But to the extent New York judicial decisions contradict non-binding sources, New York case law prevails.

"As in contract law more generally, a sale by auction is valid only upon offer and acceptance." In re NextWave Pers. Commc'ns, Inc., 200 F.3d 43, 60 (2d Cir. 1999) (citations omitted).  In general, there are three types of auctions, each of which defines differently whether and when an "offer" and "acceptance" occurs.  In an absolute auction, also known as an auction without reserve, the seller makes an offer by advertising the sale, and the highest qualified bidders' bid constitutes an acceptance.  7 Am. Juris. 2d Auctions & Auctioneers § 36.  In such auctions, the owner of the property may not withdraw the property after bidding has begun, bid on the property itself (as this would have the effect of withdrawing the property from sale) or refuse to transfer the property to the highest qualified bidder without being liable for breach of contract.  Drew, 241 N.Y.S.2d at 269.

By contrast, in an auction with reserve, "the seller reserves the right to refuse to accept any bid made, [and] a binding sale is not consummated between the seller and the bidder until the seller accepts the bid." In re Nextwave, 200 F.3d at

60 (quoting 7 Am. Juris. 2d Auctions & Auctioneers § 34); see also Drew, 241 N.Y.S.2d at 269-70. The seller's advertisement of the auction "is not an offer to sell which becomes binding, even conditionally, on the owner when a bid is made, but is a mere declaration of the intention to hold an auction at which bids will be received; the contract of sale becomes complete only when the bid is accepted." 7 Am. Juris. 2d Auctions & Auctioneers § 14; see also Corbin on Contracts § 2.3 (4th ed.) ("The advertisement [of an auction] is not an offer. It is a request for offers. This is true even though it may be common practice to accept the best bid made."). The seller's reserve prices—i.e., the "prices below which an item may not be sold at auction"—are "agreed to by the seller and the auctioneer and are not made public." Slukina, 2013 WL 4446914, at *4 (quoting 7 N.Y. Juris. 2d Auctions & Auctioneers § 3).

Finally, in a conditional auction, "the seller reserves the right to accept or reject bids after the close of the bidding; those conditions generally inform potential buyers that the auctioneer does not have the authority to accept the high bid and that bids will remain mere offers until accepted by the sellers." Id. at *5. Thus, while a seller may not withdraw auctioned property after the close of bidding in either an auction with or without reserve, it may do so in a conditional auction. See id.

### 3. Analysis

Wells Fargo principally argues that HoldCo has no interest in the Subject Securities because it held the January Auction with reserve, as evidenced by the lack of any language indicating that the auction was without reserve. (ECF No. 25

at 7-10.)  As a result, Wells Fargo insists that Dock Street, in its capacity as Wells Fargo's liquidation agent, never accepted Guggenheim and Sandler's bids on the three Subject Securities, and no enforceable sales contract was formed.  (Id. at 10.)  The Court agrees.

Under New York law, an auction is presumed to proceed "with reserve" unless the auction is "expressly announced to be 'without reserve.'"  See Drew, 241 N.Y.S.2d at 269; see also 7 N.Y. Juris. 2d Auctions & Auctioneers § 3 (same).  As both HoldCo and Wells Fargo recognize, a seller may satisfy Drew's clear statement requirement without including the precise words "without reserve" in the auction notice.  (See ECF Nos. 42 at 4-8 and 59 at 3.)  Rather, to establish an auction without reserve, the seller must "express such an intention clearly and bring it sufficiently to the attention of the bidders."  Corbin on Contracts § 4.14.  HoldCo offers two principal arguments in favor of finding an absolute auction in this case.  First, HoldCo contends that Wells Fargo manifested its intent to hold the auction without reserve when it included language in the Invitation to Bid and Notice indicating that the Subject Securities would trade to the highest bidder on a specific date.  (ECF No. 47 at 13-15.)  Second, HoldCo insists that in the CDO liquidation auction market ("CDO liquidations"), an auction is presumed to be held without reserve unless the seller "employs language in its auction notices that clearly discloses to the market that the auction is with reserve or is subject to a credit bid."  (Id. at 20.)  HoldCo argues that the Invitation to Bid and Notice lacked such

language, and therefore the auction proceeded without reserve.  (Id.)  For several reasons, both arguments fail.

a.  Evidence of Intent

HoldCo's argument that a seller's "statement that an item will sell to the highest bidder on a date certain creates an absolute auction" (id. at 8-11) is squarely foreclosed by New York case law.  In Drew, the Appellate Division made clear that "[t]he statement that the sale would be made to the highest bidder is not the equivalent of an announcement that the auction would be 'without reserve.'"  Drew, 241 N.Y.S.2d at 270 (citing U.C.C. § 2-328(3) (Am. Law. Inst. & Unif. Law Comm'n 2016)).  Rather, "[a]n announcement that a person will sell his property at public auction to the highest bidder is a mere declaration of intention to hold an auction at which bids will be received."  Id. (quoting Anderson v. Wis. Cent. Ry. Co., 120 N.W. 39, 46 (Minn. 1909) (internal quotation marks omitted).

HoldCo does not seriously dispute this aspect of Drew's holding, but instead attempts to distinguish Drew based on the type of property being sold.  As HoldCo notes, Drew concerned an auction of a good (a tractor), which is governed by Article II of the Uniform Commercial Code (the "UCC"), while the present case concerns an auction of securities, which are not covered by Article II of the UCC.  (See ECF No. 42 at 8-9.)  While it is certainly possible for auctions within different industries to have different rules and norms, see, e.g., Dulman v. Martin Fein & Co., 411 N.Y.S.2d 358, 362 (1978) (noting that a rule developed in the context of securities auctions may not apply to auctions of goods), HoldCo has not pointed to any case

17

law suggesting that <u>Drew</u>'s rule applies only in auctions for goods. In fact, a New York case involving an auction of an apartment in a cooperative apartment building, which is also not governed by Article II of the UCC, relied on <u>Drew</u>'s framework in determining whether or not an auction had proceeded with or without reserve. <u>See</u> <u>Slukina</u>, 2013 WL 4446914, at *3-5. There is thus no reason to think that <u>Drew</u>'s statement of the law fails to apply in this case.

HoldCo further suggests that <u>Drew</u>'s rule only applies to notices that promise to sell property to the highest bidder, not notices that promise to sell property to the highest bidder on a specific date after receiving sealed bids, as the Invitation to Bid does here. (<u>See</u> ECF No. 68 at 6-7.) In those specific set of circumstances, HoldCo asserts that the rule set forth in <u>Golfinopoulos v. Padula</u>, 526 A.2d 1107 (N.J. Super. Ct. App. Div. 1987)—a purportedly "seminal" New Jersey Superior Court, Appellate Division case concerning a closed-bid auction sale of a farm—applies. In <u>Golfinopoulos</u>, the court held that a provision in the invitation to bid providing that the "'[c]ontract will definitely be awarded on Friday, May 30, 1986 to the highest responsible bidder' . . . transformed the sale to the equivalent of a sale 'without reserve.'" <u>Id.</u> at 1110. HoldCo suggests that substantially similar language appears in the Invitation to Bid for the January Auction (<u>i.e.</u> "[Wells] will sell the property described on Exhibit A attached hereto (the 'Collateral') to the highest qualified bidder or bidders in five public sales as set forth below (the 'Sales')," and "[u]nless otherwise specified, the Sale of each security will settle not later than on a T+3

basis (the 'Settlement Date')"), and therefore the January Auction was without reserve. (See ECF No. 47 at 13, 15.)

Golfinopoulos, however, does not support HoldCo's claim. The Golfinopoulos court made clear that it was "[t]he definite award language" in the invitation to bid in that case that "raise[d] the [invitation] from a solicitation for offers from prospective purchasers to a firm offer to sell upon the particular terms, to be accepted by the act of bidding and declaration that the bid is the highest received." 526 A.2d at 1111 (emphasis added). HoldCo insists that there is no difference between the use of the term "will definitely be awarded" in the Golfinopoulos documents and the use of the words "will sell" and "the winning bid . . . shall be the highest qualified bid" in the January Auction Invitation to Bid and Notice. (See ECF No. 68 at 6-7 (emphasis added).) But, of course, this is precisely the argument that Drew foreclosed when it held that "[a]n announcement that a person will sell his property at public auction to the highest bidder" is insufficient to establish an auction without reserve. See 241 N.Y.S.2d at 270 (citations omitted).

Moreover, even if the Notice and Invitation to Bid could be read as creating an absolute auction under Golfinopoulos, there is no reason to think that the Golfinopoulos formulation applies in New York. HoldCo points to Nathanson v. Grand Estates Auction Co., No. 10-cv-2643, 2010 WL 4916982 (E.D.N.Y. Nov. 23, 2010), as evidence of a case applying New York law that purportedly endorsed Golfinopoulos's rule. In Nathanson, the auction terms stated that the seller "will convey" the property on or before a specific date, like the invitations to bid in

Golfinopoulos and here, and neither party disputed that the auction had proceeded without reserve. (See ECF No. 47 at 10.) However, in highlighting these similarities, HoldCo fails to account for the differences between the Nathanson notices and the Invitation to Bid and Notice at issue in this case—differences that may explain why the Nathanson auction is properly classified as without reserve, while the January Auction is properly deemed to have been with reserve. For example, the Nathanson notices explicitly state that "[t]he Seller reserves the right to withdraw the Property prior to the auction." (See Affidavit of Vikaran Ghei in Support of the HoldCo Entities' Motion for Summary Judgment and Opposition to Wells' Motion for Summary Judgment, dated October 11, 2016 ("Ghei Aff."), ECF No. 43, Ex. T § N(4).) A provision that provides for withdrawal before the start of the auction could very well manifest an intent not to withdraw property during or after the auction, as is permitted in an auction with reserve and a conditional auction. But no such similar language was included in the Invitation to Bid or Notice in this case.

Indeed, far from evincing an intent to establish an auction without reserve, the Invitation to Bid contains language that placed bidders on notice that reserves may have applied—especially when read in conjunction with the presumption that all auctions are held with reserve unless the seller manifests a clear intent to the contrary. In particular, the Invitation to Bid provides that "[t]he Trustee shall not be obligated to make any Sale and reserves the right to sell all or a part of the Collateral at a subsequent public or private Sale." (Brehm Aff., Ex. 5 § 3(a).) Wells

20

Fargo submits that this language entitled it to refuse to complete a sale, "no matter the results of the auction." (ECF No. 25 at 10.) Such language may not, in fact, have been clear enough to "generally inform potential buyers that the auctioneer does not have the authority to accept the high bid and that bids will remain mere offers until accepted by the sellers," as would be required to establish a conditional auction. See Slukina, 2013 WL 4446914, at *5. However, the Court need not decide whether Wells Fargo could have refused to sell property if Dock Street had accepted the highest bid (as is authorized in a conditional sale) because the Invitation to Bid unambiguously informed bidders that Dock Street might not accept the high bid on all securities. By stating that it was "not obligated to make any Sale," and that "all or part of the Collateral" may be sold at a later date, Wells Fargo placed participants on notice that some securities might not trade. It is hard to imagine how the bidders, who were operating against a presumption that all auctions proceed with reserve unless the seller indicates otherwise, could not view this provision as a disclaimer that reservations may have applied.

HoldCo disputes that, in stating that it "shall not be obligated to make any Sale," Wells Fargo reserved its right not to sell the Subject Securities at issue in this case. HoldCo notes that "Sale" is the singular form of "Sales," which is defined in the Invitation to Bid as the five public auctions at which the individual items of Collateral would be sold. (See ECF No. 47 at 16.) Therefore, HoldCo asserts, Wells Fargo reserved its right not to hold one or more of the five public auctions (a "Sale"),

but that once the January Auction began, Wells Fargo had no right not to sell an item of Collateral to the highest qualified bidder.  (See id. at 17.)

The parties' contract incontrovertibly refutes HoldCo's claim.  Section 5.18 of the Invitation to Bid specifically provides that "[c]apitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Indenture."  (Brehm Aff., Ex. 5 at 1.)  "Sale" is capitalized in the Invitation to Bid, but is not defined therein.  Therefore, by the Invitation to Bid's plain terms, bidders must turn to the Indenture, which defines a "Sale" as "any portion of the Trust Estate," which includes an individual item of Collateral.  (Brehm Aff., Ex. 1 § 5.18(a).)  The Invitation to Bid therefore informed participants that Dock Street might not accept bids on certain items, such as the Subject Securities at issue here.

HoldCo puts forth a host of arguments against this interpretation, each of which is readily dismissed.  First, HoldCo notes that words should be given their ordinary meanings, and it would "strain[] the contract language beyond its reasonable and ordinary meaning" to define "Sale" differently than "Sales."  (ECF No. 42 at 11 (first quote quoting In re New York Skyline, Inc., 471 B.R. 69, 87 (Bankr. S.D.N.Y. 2012) (internal quotation marks omitted).)  But it does not strain the contract language for a plural and singular form of a word to have different definitions when the contract expressly provides for the distinction.  Rather, HoldCo seeks to "ignor[e] the plain language of the contract, [and] effectively rewrite[] the bargain that was struck."  See W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642-43 (1990).  Such a maneuver is not allowed under New York law.  See id.

Second, HoldCo notes other instances where the Invitation to Bid defines a plural word, such as "Bid Response Spreadsheets," and then references the undefined singular form of the word. Because the Invitation to Bid clearly intended "Bid Response Spreadsheet" to share the same meaning as its defined plural form, HoldCo argues that "Sale" must mean the same thing as "Sales." (See ECF No. 42 at 11-12.) This argument fails for two reasons. First, neither the Invitation to Bid nor the Indenture define the singular form "Bid Response Spreadsheet," while the Indenture does separately define "Sale." (See Brehm Aff., Ex. 1 § 5.18(a).) Second, the singular and plural forms of "Bid Response Spreadsheet" are used in a consistent manner throughout the Invitation to Bid. By contrast, when the Invitation to Bid references "Sales," it refers to the public auctions, but when the Invitation to Bid references "Sale," it refers to the sale of a single item of Collateral. For instance, § 3(a) provides, in relevant part:

> The Trustee reserves the right to reject any bid which it deems to have been made by a bidder which is unable to satisfy the requirements imposed by the Trustee upon prospective bidders in connection with the Sales or to whom in the Trustee's sole judgment a Sale may not lawfully be made. The Trustee shall not be obligated to make any Sale and reserves the right to sell all or a part of the Collateral at a subsequent public or private Sale.

(Id. Ex. 5, § 3(a).) The use of "Sale" in this provision necessarily refers to the sale of an individual security because "Sales" is defined as the five public auctions. Therefore, Wells Fargo's disclaimer that it may sell part of the Collateral at a subsequent private sale makes clear that "Sale" does not refer to one of the five "Sales." Other provisions further reinforce this interpretation. Section 3(o), for

23

example, provides that "[t]he Sale of each security will settle not later than on a T+3 basis." (Id. § 3(o).) Once again, there is no way to read this provision without interpreting the term "Sale" as a transaction for an individual security.

Third, HoldCo contends that cross-referencing the Indenture to define the term "Sale" would create an "absurd conflict" because § 1.1 of the Indenture provides that "the definitions of [defined] terms are equally applicable both to the singular and plural forms of such terms" (id. Ex. 1, § 1.1), and the Indenture refers to "Sale" and "Sales" interchangeably. (ECF No. 42 at 12.) But there is no conflict here. In the Indenture, "Sale" and "Sales" refer to transaction(s) for individual securities. In the Invitation to Bid, only "Sale" is defined as it is in the Indenture, and "Sales" takes on the definition it is given in the Invitation to Bid. There is nothing "logically inconsistent" or "immensely confusing" about this state of affairs, despite HoldCo's protestations to the contrary. (See id.) Guggenheim and Sandler, on behalf of HoldCo, signed an Investor Representation contract certifying that they were sophisticated investors and that they had "reviewed all necessary materials and had access to all information requested." (Brehm Aff., Ex. 1, Ex. A ¶ 1.) As such, they surely could be expected to comprehend that two different words might be assigned two different meanings.

Fourth, HoldCo points to invitations to bid from two other CDO liquidations that Wells Fargo conducted as evidence that Wells Fargo intended the term "Sale" to share the same definition as "Sales" in this case. (See ECF No. 42 at 12-13.) Such an argument is not allowed under New York case law and will not be

24

considered here. HoldCo may not turn to extrinsic evidence "to create an ambiguity in a written agreement which is clear and unambiguous upon its face." Intercontinental Planning, Ltd., 248 N.E.2d at 580 (citations omitted). Here, the Invitation to Bid unambiguously states that all undefined capitalized terms share the definition they were given in the Indenture (see Brehm Aff., Ex. 5 at 1), and the Indenture unambiguously defines a "Sale" as a transaction for a portion of the trust estate. The Court will not allow extrinsic evidence to turn these clear provisions on their heads.

Finally, HoldCo states that § 3(a) of the Invitation to Bid should not be read as a "blanket reservation of rights" because the Invitation to Bid contains other, more specific reservations authorizing Wells Fargo to reject bids from unqualified or unlawful bidders. (See ECF No. 42 at 14-15.) In particular, § 3(a) provides that "[t]he Trustee reserves the right to reject any bid which it deems to have been made by a bidder which is unable to satisfy the requirements imposed by the Trustee upon prospective bidders in connection with the Sales or to whom in the Trustee's sole judgment a Sale may not lawfully be made." (Brehm Aff., Ex. 5 § 3(a).) And in § 3(g), Wells Fargo states that it "will accept bids only from such of those persons to whom in its sole judgment a Sale may lawfully be made." (Id. § 3(g).) Though a court should generally "not adopt an interpretation which will operate to leave a provision of a contract without force and effect," JA Apparel Corp. v. Abboud, 568 F.3d 390, 405 (2d Cir. 2009) (quoting Corhill Corp. v. S. D. Plants, Inc., 176 N.E.2d 37, 38 (N.Y. 1961)), that canon carries less weight here, for two reasons. First, the

reservations in §§ 3(a) and 3(g), though not identical, overlap enough to indicate that the drafters of this contract were not overly concerned with repetitive reservations.  (Compare Brehm Aff., Ex. 5 § 3(a) ("The Trustee reserves the right to reject any bid which it deems to have been made by a bidder . . . to whom in the Trustee's sole judgment a Sale may not lawfully be made."), with id. § 3(g) ("The Trustee will accept bids only from such of those persons to whom in its sole judgment a Sale may lawfully be made.").)[4]  Second, the Invitation to Bid was drafted against a presumption that the January Auction would be held with reserve unless Wells Fargo specified otherwise.  It makes little sense, then, to find that Wells Fargo somehow expressed an intent to hold the January Auction without reserve by including excessive or redundant reservations.  If Wells Fargo could have reserved its right to reject bids without including any express statements to that effect, it will not be deemed to have lost that right by including too many.[5]

---

[4] Other repetitive provisions further reinforce this point.  Compare id. § 3(k) ("All bids submitted must be irrevocable and unconditional and held open for no less than three (3) hours."), with id. § 3(n) ("All bids submitted must be irrevocable and unconditional.").

[5] HoldCo offers three additional arguments on the proper interpretation of "Sale," none of which merits much discussion.  First, HoldCo argues that even if Wells Fargo's interpretation of "Sale" is correct, § 3(a) would not allow Wells to avoid delivering the Subject Securities to the highest qualifying bidder because Wells Fargo did not create a "conditional auction."  (ECF No. 42 at 14-15.)  While the lack of a conditional auction would prevent Wells Fargo from refusing to deliver a security to the highest bidder after Dock Street accepted the bid, it does not preclude Dock Street from refusing to accept the offer of the highest bidder if that bid remains below the reserve threshold.  See Slukina, 2013 WL 4446914, at *4-5.  Second, HoldCo states that if Wells' interpretation of the word "Sale" is "technically correct," the Court should find that Wells acted "contrary to the inherent duty of good faith in contracts."  (See ECF No. 42 at 13.)  But HoldCo cannot seek relief in a brief for a claim it has not alleged in its counterclaims.  Cf. Ace Arts, LLC v. Sony/ATV Music Pub., LLC, 56 F. Supp. 3d 436, 451 (S.D.N.Y. 2014) ("[I]t is 'axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss.'" (quoting Muniz v. Morillo, No. 06-cv-6570, 2008 WL 4219073, at *6 (S.D.N.Y. Sept. 10, 2008))).  In addition, the duty to exercise good faith encompasses only "promises which a reasonable person in the position of the promisee would be justified in understanding were included." Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995)

Taken together, the Invitation to Bid, Notice and Indenture, when read against the presumption set forth in <u>Drew</u> that an auction proceeds with reserve unless the seller manifests a contrary intent, unambiguously reserved Wells Fargo's right not to accept qualifying bids that fell below the reserve price for any given security.[6] Because Guggenheim and Sandler's bids for the Subject Securities fell below the reserves established for those items (<u>see</u> Crowle Aff., Ex. E), those securities did not trade and no contract between Wells Fargo and HoldCo was formed.

### b. Industry Custom

HoldCo seeks to bypass the above conclusion by arguing that auctions for securities driven by defaults of CDOs operate in a specialized market, and in that industry, auctions proceed without reserve unless a seller "prominently convey[s] that a specific CDO liquidation would be handled differently than the expected

---

(quoting <u>Rowe v. Great Atl. & Pac. Tea Co.</u>, 385 N.E.2d 566, 569 (N.Y. 1978)). It is not reasonable for a sophisticated investor, such as HoldCo, to insist "Sale" and "Sales" necessarily must share the same definition when Wells Fargo clearly laid out the way to interpret capitalized terms and HoldCo's agents certified that they "reviewed all necessary materials and had access to all information requested." (<u>See</u> ECF No. 38, Ex. 2, Ex. A ¶ 1.) Finally, HoldCo argues that if the Court finds the term "Sale" to be ambiguous, it should construe the ambiguity against Wells Fargo, which purportedly drafted the Invitation to Bid and Notice. (ECF No. 42 at 16.) The Court does not find the term to be ambiguous and thus interprets it precisely as it is written.

[6] HoldCo initially argued that Wells Fargo failed to set reserve prices. (<u>See</u> ECF No. 42 at 22.) An email Wells Fargo submitted in connection with David Crowle's Reply Affidavit shows that counsel for Wells Fargo confirmed Dock Street's acceptance of the proposed reserve prices before the January Auction commenced. (<u>See</u> Reply Affidavit of David Crowle in Further Support of the Trustee's Motion for Summary Judgment and in Opposition to HoldCo's Cross-Motion for Summary Judgment ("Crowle Reply Affidavit"), ECF No. 57, Ex. A.) HoldCo has not indicated that this fact remains in dispute. In any event, as Wells Fargo noted, an auction proceeds with reserve regardless of whether reserve prices are communicated ahead of time to the auctioneer. <u>See</u> <u>In re Nextwave</u>, 200 F.3d at 61 ("Auctions with reserve stand or fall as a matter of the seller's discretion, usually on the basis of the pecuniary sufficiency of the bids."); <u>Slukina</u>, 2013 WL 4446914, at *4 ("[A] reserve auction[] . . . affords a seller an <u>opportunity</u> to set an undisclosed reserve amount below which the unit will not be sold to the prospective bidder." (emphasis added)).

norm." (ECF No. 47 at 19.)  In effect, HoldCo argues that all notices in CDO liquidations contain an implicit term that the auction will proceed without reserve unless otherwise explicitly stated.  This argument fails as a matter of law.

First and foremost, evidence of trade usage and industry custom may not be introduced to contradict an express term of a contract.  See B. M. Heede, Inc. v. Roberts, 103 N.E.2d 419, 420-21 (N.Y. 1952) ("[P]arol evidence may be given as to the uniform, continuous, and well-settled usage and custom pertaining to the matters embraced in the contract, unless such usage and custom contravene a rule of law, or alter or contradict the expressed or implied terms of a contract, free from ambiguity." (quoting Atkinson v. Truesdell, 27 N.E. 844, 845 (1891)) (internal quotation marks omitted));  see also Kologel Co. v. Down in the Vill., Inc., 539 F. Supp. 727, 729 (S.D.N.Y. 1982) ("A trade usage may be helpful in interpreting an ambiguous contract, but where, as here, the usage and the express terms of a contract are in direct opposition, 'express terms control . . . usage of trade.'" (quoting UCC § 1-205(4))).  As detailed above, the Invitation to Bid unambiguously provides that "[t]he Trustee shall not be obligated to make any Sale and reserves the right to sell all or a part of the Collateral at a subsequent public or private Sale."  See supra Section III.A.3.a; see also Brehm Aff., Ex. 5 § 3(a).  HoldCo argues, in effect, that where the contract states Wells Fargo "shall not be obligated to make any Sale," trade usage and custom dictate otherwise.  Evidence of custom may not be introduced for this purpose, and thus the Court finds that HoldCo's arguments on this point are irrelevant to the matter at hand.

Even if trade usage and custom could be introduced to controvert a clear contractual provision, HoldCo has failed to submit admissible evidence in support of its claimed custom.  In deciding a summary judgment motion, a district court "has broad discretion in choosing whether to admit evidence . . . . [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Presbyterian Church Of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997)) (internal quotation marks omitted).  Here, HoldCo's trade and usage argument rests almost exclusively on an affidavit and expert report submitted by a purported expert in the CDO liquidation industry, Julie Veltman.[7]  (See Affidavit of Julie Veltman in Support of the HoldCo Entites' Motion for Summary Judgment and Opposition to Wells' Motion for Summary Judgment, dated October 10, 2016 ("Veltman Aff."), ECF No. 44.)  Under Federal Rule of Evidence 702, which governs the admissibility of expert testimony, "[a] witness is qualified [to render his or her

---

[7] HoldCo also submitted an affidavit from Vikaran Ghei, a founding partner of HoldCo Asset Management, L.P., who asserts:

> Based on my experience as a market participant and observer in auctions of collateral by trustees of defaulted collateral debt obligations . . . the industry practice is that (i) all collateral in the CDO liquidation trades – without reservation – to the highest qualified bidder; (ii) that noteholders of a CDO, such as Och-Ziff was in respect of Soloso, typically protect against the risk of receiving low bids by bidding in the auction themselves (or in certain circumstances, credit bidding their secured notes), rather than setting reserves; and (iii) that if there is even a specter that reserves (or credit bidding) may apply, that the possibility of such reserves (or credit bidding) will be disclosed and the language in the notices will be qualified to reserve the right to accept bids to the trustee.

(Ghei Aff., ¶ 15.)  HoldCo has not held Ghei out as an expert in the customs of CDO liquidation auctions, nor would Ghei's mere reference to his unspecified "experience as a market participant and observer" qualify him as an expert on this matter.  Cf. Lewis v. Velez, 149 F.R.D. 474, 487 (S.D.N.Y. 1993) (finding there was "no showing that [reporter] is qualified as an expert" where expert's prior experience were "not detailed").

opinions as an expert] where he or she has 'superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" <u>Vale v. United States of Am.</u>, 673 F. App'x 114, 116 (2d Cir. 2016) (quoting <u>United States v. Tin Yat Chin</u>, 371 F.3d 31, 40 (2d Cir. 2004)). "The party proffering the expert has the burden to demonstrate that its expert witness satisfies these criteria." <u>R.F.M.A.S., Inc. v. So</u>, 748 F. Supp. 2d 244, 249 (S.D.N.Y. 2010). HoldCo has failed in this regard.

Veltman's purported expertise in "Event of Default ('EOD') CDO liquidations" is derived from her "11 years of experience" and "tens of thousands of hours" spent "working in the CDO markets, including CDO liquidations." (Veltman Aff., ¶ 6.) A review of her experience makes clear that she is not an "industry" expert.

"[W]hile Rule 702 specifically contemplates that expert testimony may be based upon experience, the witness must show why that experience provides a reliable foundation for his or her testimony." <u>Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC</u>, 691 F. Supp. 2d 448, 473 (S.D.N.Y. 2010); <u>see also</u> <u>Mahoney v. JJ Weiser & Co.</u>, No. 04 Civ. 2592, 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007) ("An expert may indeed be excluded when his training and experience is lacking in the particular area in which his testimony is offered." (quoting in parenthetical <u>Crowley v. Chait</u>, 322 F. Supp. 2d 530, 538 (D.N.J. 2004)) (internal quotation marks omitted)). Here, Veltman's resume details her experience with structuring CDO deals, selling and trading CDOs, and engaging in "private transactions stemming from CDO auctions," but her actual involvement in CDO

liquidations is seemingly limited to her work "marketing, selling and facilitating trades in various CDOs" from 2012 to 2014. (Veltman Aff., ¶¶ 7-10.) Veltman does not describe how many liquidations she has been involved in and what, beyond "trade execution and client advis[ing]," her role entailed. (See id. ¶ 10.) In addition, Veltman has not been involved in the CDO market in any capacity since 2014. (Id. ¶ 11.) Though a witness no longer operating in the area of her purported expertise may still be qualified to opine on practices with which she has "remained familiar," see Pension Comm. of Univ. of Montreal Pension Plan, 691 F. Supp. 2d at 479, Veltman has provided no information to suggest she has kept abreast of current market practices and customs, cf. Medisim Ltd. v. BestMed LLC, 861 F. Supp. 2d 158, 168 (S.D.N.Y. 2012) (finding witness's experience regarding digital, conductive thermometry was not "stale" where "witness continued to work with medical device manufacturers in a variety of fields and has consulted on several projects directly related to digital conductive thermometry"), on reconsideration in part, No. 10 Civ. 2463, 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012). In short, even if HoldCo's custom-and-usage were relevant, HoldCo has not persuaded the Court of its admissibility.

Even setting the above issues aside, Veltman's affidavit and report do not advance HoldCo's custom-and-usage claims. Veltman asserts, based on her personal experience in the industry, that market participants expect that collateral auctioned in a CDO liquidation will be sold to the highest qualified bidder on the date of the auction. (Id. ¶ 22.) She further contends that this market expectation

"is validated by [Well's Fargo's] actual practice," as evidenced by her review of thirty-eight EOD CDO liquidations where Wells Fargo served as trustee.  (Id. ¶ 24.) According to Veltman, more than 99.9% of the collateral items in those auctions traded to the highest qualified bidder on the date of the auction.  (Id. ¶ 23.)  In light of these statistics and purported expectations, Veltman opines that bidders would assume collateral might not trade only "if it was prominently conveyed that a specific CDO auction would behave differently than the expected norm."  (Id. ¶ 24.) Veltman believes Wells Fargo "understood the market practice," as demonstrated by the fact that it employed two types of CDO liquidation forms in the thirty-eight auctions she reviewed:  in nineteen of the auctions, the notices included language stating that "reserve levels may apply," and in nineteen of the auctions, the notices did not.  (Id. ¶ 25.)[8]  Veltman thereby concludes that "if Wells wanted to preserve their right to set reserve levels, or provide for credit bidding, they would use the form document that provided for the possibility of reserve levels applying."  (Id.)

But even if the Court were to assume that participants generally expect all collateral to trade, this "fact" simply does not provide any useful information about whether CDO liquidations presumptively proceed without reserve.  Veltman's analysis offers no way to mediate between an expectation that all collateral will trade because it usually does and an expectation that all collateral will trade because it must.  Perhaps something could be gleaned from the fact that 99.952% of

[8] In addition, eight of the thirty-eight notices stated that that the Super Senior Noteholder may "credit bid."  (Id.)  Veltman explains that "reserve and credit bid language could both lead potential bidders in the auction to believe that the auction may not trade at market levels."  (Id.)

collateral traded in auctions that excluded reserve language in the accompanying notices (see ECF No. 68 at 10) if a different pattern had developed in auctions where Wells Fargo had disclosed that reserves may apply. But, of course, Veltman found otherwise: 99.887% of collateral traded in auctions that <u>included</u> reserve language in the disclosures. (Veltman Aff., Ex. 2 at 25.) Thus, even when "view[ing] the evidence in the light most favorable" to HoldCo and "draw[ing] all reasonable inferences in favor of that party," see <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 122 (2d Cir. 2004), the Court sees no reasonable basis for linking a high trade rate in "reserve language excluded" auctions to an obligation to make trades when the same high trade rate emerged in "reserve language included" auctions—<u>i.e.</u>, auctions in which Wells Fargo was incontrovertibly not required to make trades.[9]

### 4. Motion for Relief Pursuant to Fed. R. Civ. P. 56(d)

After the parties' cross-motions for summary judgment were fully briefed, HoldCo filed a motion pursuant to Federal Rule of Civil Procedure 56(d) requesting leave from the Court to obtain discovery from four other trustees associated with the CDO liquidation market. (ECF No. 74; <u>see also</u> Affidavit of Vikaran Ghei in Support of the HoldCo Entities' Motion for Relief Pursuant to Fed. R. Civ. P. 56(d), dated November 15, 2016 ("Ghei 56(d) Aff."), ECF No. 76 ¶ 13.) Specifically, HoldCo seeks production of all auction notices and post-auction trustee reports for each

---

[9] According to HoldCo, auction notices that included "reserve levels may apply" language were auctions with reserve (see ECF No. 42 at 20-21), which necessarily means that Wells Fargo was not obligated to make any trades, see <u>In re Nextwave</u>, 200 F.3d at 60 (noting that in an auction with reserve, "the seller reserves the right to refuse to accept any bid made").

CDO liquidation that the four non-Wells Fargo trustees have conducted since October 2008, along with the marketing and advertising materials relating to each of these liquidations. (Ghei 56(d) Aff. ¶¶ 14-15.) Holdo also requests the opportunity to depose each of the four CDO trustees "to confirm that the custom and usage in the industry is as set forth in the Veltman Affidavit." (Id. ¶ 15.) HoldCo's motion is denied.

Critically, HoldCo expressly conditioned its requests on circumstances not present here. According to the memorandum of law and affidavit accompanying its 56(d) motion, HoldCo seeks discovery "if, and only if, the Court agrees" with a critique set forth in Wells Fargo's opposition to HoldCo's cross-motion for summary judgment—namely, that Veltman's analysis is fundamentally incapable of providing evidence of an industry-wide custom because she reviewed the forms associated with only thirty-eight auctions, all of which were conducted by a single trustee (Wells Fargo). (See Ghei 56(d) Aff. ¶ 12; see also ECF No. 56 at 9.)[10] The Court's decision to deny HoldCo's cross-motion for summary judgment and to grant Wells Fargo's motion for summary judgment in no way turns on this purported deficiency in Veltman's report. Therefore, HoldCo's motion under Rule 56(d), by its own terms, is moot.

---

[10] See also ECF No. 84 at 1-2 ("[T]he HoldCo Entities are simply requesting, out of an abundance of caution, an opportunity to conduct limited and targeted discovery to the extent the Court believes that Wells' past conduct and practices are insufficient to establish a custom and usage. If, and only if, the Court believes this to be the case, the HoldCo Entities should be afforded the opportunity to complete the record and supplement the Veltman Affidavit with limited discovery as set forth in the 56(d) Motion.").

In any event, HoldCo's motion is denied because HoldCo has not and cannot show how its requested discovery is "reasonably expected to create a genuine issue of material fact," as is necessary to obtain relief under Rule 56(d).  See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) (quoting Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995)).  As the Court explained above, custom evidence is not admissible to controvert express terms of the Invitation to Bid.  See supra Section III.A.3.b.  Any additional extrinsic evidence on this point obtained through discovery would remain inadmissible, and therefore would not lead to a triable issue of material fact.  See id.

For the reasons stated above, the Court finds that the auction proceeded "with reserve," and Dock Street, acting on behalf of Wells Fargo, was entitled to reject HoldCo's bids.  The Court therefore GRANTS Wells Fargo's motion for summary judgment in its entirety (ECF No. 24) and DENIES HoldCo's cross-motion for partial summary judgment in its entirety (ECF No. 46).  The Court further DENIES HoldCo's motion for relief pursuant to Fed. R. Civ. P. 56(d).  (See ECF No. 74.)

B.     Wells Fargo's Motion to Dismiss

The Court now turns to Wells Fargo's motion to dismiss HoldCo's seven counterclaims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF No. 53.)  When resolving a motion to dismiss a counterclaim, a court must accept all allegations in the counterclaim as true and draw all reasonable inferences in favor of the pleader (i.e., HoldCo).  See Universal

Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co., 196 F. Supp. 2d 378, 382 (S.D.N.Y. 2002) (citing Weinstein v. Albright, 261 F.3d 127, 131 (2d Cir. 2001)).  A counterclaim can survive a motion to dismiss under 12(b)(6) only if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

At the motion to dismiss stage, a court may consider "any written instrument attached to the [counterclaim] as an exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)) (internal quotation marks omitted); see also Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  The Court may also consider a document that is not incorporated by reference or attached to the counterclaim if the counter-plaintiff "relies heavily upon its terms and effect."  Chambers, 282 F.3d at 153 (quoting Int'l Audiotext Network, 62 F.3d at 72) (internal quotation marks omitted).

1.    Contractual Claims

HoldCo has raised three contractual counterclaims: Count One seeks declaratory judgment (ECF No. 38 ¶¶ 137-42), Count Two alleges breach of contract (id. ¶¶ 143-47) and Count Three seeks specific performance (id. ¶¶ 148-60).  Setting

aside HoldCo's claim for specific performance, which is not a viable cause of action under New York law,[11] an essential element of both the declaratory judgment and breach of contract claims is the existence of a binding contract between Wells Fargo and HoldCo regarding the sale of the Subject Securities. (See ECF No. 38 ¶ 141 (seeking declaratory judgment that "an enforceable contract arose as a result of [HoldCo's] . . . bids")); see also Dee v. Rakower, 976 N.Y.S.2d 470, 474 (App. Div. 2013) ("[An] essential element[] for pleading a cause of action to recover damages for breach of contract [is] the existence of a contract."). Because the Court has determined that no such contract exists, see supra Section III.A.3, these two counterclaims are moot. See Powell v. McCormack, 395 U.S. 486, 496 (1969) ("Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.") (citation omitted); see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 727 F. Supp. 2d 256, 284 (S.D.N.Y. 2010) (dismissing intervening defendant's counterclaim as moot where claim was contingent on interpreting indenture in plaintiff's favor, given that court had already interpreted indenture in intervening defendant's favor).

"It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or

---

[11] As HoldCo has recognized since filing its Answer and counterclaims, "[s]pecific performance is an equitable remedy for a breach of contract, rather than a separate cause of action." RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 Civ. 25, 2011 WL 3251554, at *16 (S.D.N.Y. July 28, 2011) (quoting Cho v. 401-403 57th Street Realty Corp., 752 N.Y.S.2d 55, 56 (App. Div. 2002) (internal quotation marks omitted) (alteration in original)). HoldCo asks the Court "to consider Count 3 as a remedy for breach of the contract formed in the January Auction or in the alternative grant the HoldCo Entities leave to replead Count 3 as a remedy." (ECF No. 71 at 6.) Because the Court is denying HoldCo's breach of contract claim, this request is moot.

rules of law which cannot affect the matter in issue in the case before it.'" Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)). Thus, because the Court lacks subject matter jurisdiction over HoldCo's contractual counterclaims, Counts One, Two and Three of HoldCo's counterclaims are properly disposed of on that ground. Cf. In re Charter Commc'ns, Inc., 691 F.3d 476, 481 (2d Cir. 2012) (describing "constitutional mootness" as a "threshold question"). Wells Fargo's motion to dismiss these claims for failure to state a claim is therefore denied as moot.

        2.   Tort Claims

HoldCo's fourth and five counterclaims are for conversion and replevin, respectively. Under New York law, "[c]onversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (quoting Rolls–Royce Motor Cars, Inc. v. Schudroff, 929 F. Supp. 117, 124 (S.D.N.Y. 1996)) (internal quotation marks omitted). Along a similar vein, "replevin is a remedy employed to recover a specific, identifiable item of personal property." Heckl v. Walsh, 996 N.Y.S.2d 413, 415 (App. Div. 2014)). In its conversion claim, HoldCo alleges that Wells Fargo is "impermissibly exercising an unauthorized dominion over the Subject Collateral and the proceeds" and seeks damages flowing from Wells Fargo's refusal to deliver title and possession of the Subject Collateral to HoldCo. (ECF No. 38 ¶¶ 163, 165, 167.) Relatedly, HoldCo alleges in its replevin claim that Wells Fargo has "wrongfully detained the Subject Collateral" in light of

HoldCo's "superior right to obtain possession of the Subject Collateral," and HoldCo thereby asserts the right "to recover immediate possession of the Subject Collateral and any proceeds received thereon since the January Auction." (Id. ¶¶ 170-71, 173.)

In Count Six, HoldCo alleges that Wells Fargo breached its duty to conduct a fair auction "by deviating from the terms of the [Invitation to Bid] and asserting that the January Auction was with reserve when it was not." (Id. ¶ 178.) Under New York law, in "a private auction [involving] selected potential purchasers who submitted written bids, the auction [must] . . . be conducted fairly pursuant to its terms." Valeo Engine Cooling, Inc. v. Guy F. Atkinson Co. of Cal., 658 N.Y.S.2d 285, 286 (App. Div. 1997) (holding plaintiff stated claim for breach of duty to conduct a fair auction where defendants promised to "promptly execute and deliver a definite purchase agreement" upon acceptance of an offer, but instead rescinded "acceptance of plaintiff's offer in favor of a higher offer allegedly submitted after the deadline for submitted offers" had passed); but see Nathanson, 2010 WL 4916982, at *5 (noting "contours" of duty to conduct a fair auction "are hazily defined"). HoldCo alleges such a duty existed here, given that only parties that had been approved by Wells, via Dock Street, could participate in the January Auction, and bids were accepted only if they were submitted in writing via fax or email. (ECF No. 38 ¶¶ 176-77.)

Finally, HoldCo asserts in Count Seven that Wells Fargo engaged in a reckless or negligent misrepresentation when it used "the Standard Form for absolute auctions" in the Notice for the January Auction. (Id. ¶ 182.) To state a

claim for negligent misrepresentation in a commercial setting, a plaintiff must allege that

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citing King v. Crossland Savs. Bank, 111 F.3d 251, 257-58 (2d Cir. 1997)).  Here, HoldCo alleges that Wells Fargo misrepresented to the HoldCo entities that January Auction was absolute when it was in fact with reserve, and thereby induced HoldCo and other market participants to participate in the January Auction.  (ECF No. 38 ¶¶ 182-83.)  HoldCo further alleges that it was justified in relying, and did rely, on the Notice and Invitation to Bid "for the proposition that the Collateral sold in the January Auction would trade to the highest qualified bidder," and were "substantially and directly harmed" as a result.  (Id. ¶¶ 184-85.)

HoldCo's four tort claims fail under Rule 12(b)(6).  First, the conversion, replevin and negligent representation claims are unduly duplicative of HoldCo's breach of contract claim, and must therefore be dismissed.  Second, HoldCo's negligent misrepresentation claim fails on the separate ground that HoldCo has failed to allege (and, in fact, cannot allege) a special relationship between Wells Fargo and HoldCo such that a duty may lie. And finally, HoldCo has failed to state a claim premised on Wells Fargo's duty to conduct a fair auction because it has not pleaded sufficient facts to establish breach.

40

a.  <u>Conversion and Replevin</u>

A plaintiff suing under New York law may not assert tort claims that are "predicated on a breach of contract." <u>Corporacion Fruticola De Chincha v. Watermelon Depot, Inc.</u>, No. 05 CIV. 6293, 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008) (applying rule to conversion claim); <u>see also</u> <u>Usov v. Lazar</u>, No. 13 CIV. 818, 2013 WL 3199652, at *7 (S.D.N.Y. June 25, 2013) (applying rule to replevin claim).  "Abstractly, a tort may accompany a breach of contract, but only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated." <u>Luxonomy Cars, Inc. v. Citibank, N. A.</u>, 408 N.Y.S.2d 951, 954 (App. Div. 1978).  Where, however, a "plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." <u>Usov</u>, 2013 WL 3199652, at *7 (quoting <u>Sommer v. Fed. Signal Corp.</u>, 593 N.E.2d 1365, 1369 (N.Y. 1992)) (where plaintiff alleged defendant had breached contract to provide plaintiff with profits from sale of diamond collection, plaintiff could not separately assert replevin claim because "Plaintiff does not allege any independent duty by Defendants outside of the purported contracts," <u>id.</u> at *7, and could not separately assert conversion claim because "Plaintiff's claim for conversion is based on the same facts upon which Plaintiff pled its breach of contract claim, and Plaintiff does not identify any legal duty independent of the purported contractual agreements," <u>id.</u> at *8).

Here, HoldCo's replevin and conversion claims are "based upon 'the same facts upon which [p]laintiff[] pleaded [its] breach of contract claim.'" <u>Jain v. T & C</u>

41

Holding Inc., No. 10 Civ. 1006, 2011 WL 814659, at *6 (S.D.N.Y. Mar. 3, 2011) (quoting Nwagboli v. Teamwork Transp. Corp., No. 08 Civ. 4562, 2009 WL 4797777, at *5 (S.D.N.Y. Dec. 7, 2009)).  In both the replevin and conversion counts, Wells Fargo's alleged duty to deliver the Subject Securities to HoldCo and the alleged damages stemming from Wells Fargo's failure to deliver are derived entirely from a purported contractual obligation flowing from Wells Fargo to HoldCo.  As a result, HoldCo has failed to identify an "independent duty" supporting its replevin and conversion claims, and such claims are therefore barred as duplicative of the underlying breach of contract claim.

HoldCo seeks to avoid this conclusion by arguing that Wells Fargo has not simply retained the Subject Securities in violation of its contractual duties, but is also improperly "using the proceeds received on the Subject Collateral for its own benefit."  (ECF No. 71 at 15.)  In particular, HoldCo asserts that Soloso, as a CDO, earns income only through the proceeds received on its constituent collateral, and therefore "the only way for Soloso to pay Wells' trustee and attorneys' fees . . . is with proceeds received on the Collateral, including the Subject [Securities]."  (Id.)  But this alleged misuse still sounds in contract.  Wells Fargo is prohibited from using the proceeds from the Subject Securities only if Wells Fargo was contractually required to sell the Subject Securities to HoldCo during the January Auction.

HoldCo's claims are therefore distinguishable from the claims asserted in Fabry's S.R.L. v. IFT Int'l, Inc., No. 02 Civ. 9855, 2003 WL 21203405 (S.D.N.Y. May 21, 2003), and Mosallem v. Matrix Int'l Logistics, Inc., No. 03 CIV. 7626, 2004 WL

97690 (S.D.N.Y. Jan. 20, 2004)—two cases HoldCo cites where plaintiffs were permitted to bring both conversion and breach of contract claims. In <u>Fabry's</u>, the defendant agreed to collect payments from the plaintiff's customers and forward all payments to the plaintiff, less fees and transfer costs. 2003 WL 21203405, at *1. After the defendant failed to forward along payments, the plaintiff terminated the parties' agreement. <u>Id.</u> The defendant nevertheless continued to collect payments from the plaintiff's customers, without authorization, and continued to withhold the payments from plaintiff. <u>Id.</u> at *4. In that case, the plaintiff properly asserted a breach of contract claim, which sought damages based on defendant's failure to forward payments as required under the parties' contract, and a conversion claim, which arose from the defendant's continued collection and retention of payments from plaintiff's customers after the parties' agreement had been terminated. <u>Id.</u> at *3-4. The defendant therefore owed the plaintiff two duties: a contractual duty to abide by the payment delivery schedule set forth in the parties' agreement, and, following the termination of the parties' contract, a common-law duty not to collect and retain monies over which plaintiff had a superior possessory right. <u>See id.</u> at *4.[12] Similarly, in <u>Mosallem</u>, the plaintiff could properly bring a breach of contract claim for the defendant's failure to deliver goods on time, as contemplated by the parties' contract, and could also bring a claim for conversion after the defendant

---

[12] To the extent <u>Fabry's</u> can be read to have held that the defendant's failure to forward payments collected prior to the termination of the parties' contract also constituted conversion, <u>see id.</u> at *4, the case nonetheless remains distinguishable. Even absent any contract, the plaintiff in <u>Farby's</u> would have had a superior possessory right to its customer's payments over the defendant. Here, by contrast, HoldCo's sole claim to rightful possession of the Subject Securities and the proceeds therefrom stems from an alleged contract between HoldCo and Wells Fargo.

refused to deliver the goods until plaintiff paid, along with the balance of the contract price, "$10,000 in accrued bonded storage and container demurrage charges." 2004 WL 97690, at *1. As the court explained, "the additional storage and demurrage charges were not part of the contract between the parties. Thus, the claimed interference with plaintiffs' possessory right is occasioned by a cause outside the strict contemplation of the contract, and [defendant's] continued retention of plaintiffs' household goods and threat of their sale sufficiently give rise to a claim for conversion." Id. Once again, as in Fabry's, the plaintiffs' conversion claim in Mosallem turned on something more than an alleged failure to abide by the terms of a contract. Here, no such independent hook exists.

## b. Negligent Misrepresentation

Like HoldCo's claims for conversion and replevin, the negligent misrepresentation claim improperly sounds in contract. HoldCo argues that Wells Fargo promised, by the express terms of the Notice and Invitation to Bid, to hold the auction without reserve, and Wells Fargo therefore breached the parties' agreement by setting and enforcing reserves. (See ECF No. 38 ¶¶ 144-46.) Similarly, HoldCo contends that Wells Fargo represented, via the Notice and Invitation to Bid, that the January Auction would proceed without reserve, and such statements were therefore materially misleading given that the auction was, in fact, held with reserve. (See id. ¶ 182.) Thus, the very same provisions that form the basis for HoldCo's breach of contract claim also lie at the heart of its negligent representation claim. HoldCo may not recover in tort for what is essentially a

44

contractual cause of action unless HoldCo can demonstrate that Wells Fargo owed it an independent duty outside the parties' alleged contract. <u>See, e.g.</u>, <u>OP Sols., Inc. v. Crowell & Moring, LLP</u>, 900 N.Y.S.2d 48, 49 (App. Div. 2010) (barring negligent misrepresentation claim where it was "predicated upon precisely the same purported wrongful conduct as is the claim for breach of contract"); <u>LaSalle Bank Nat. Assoc. v. Citicorp Real Estate Inc.</u>, No. 02 CIV. 7868, 2003 WL 1461483, at *3 (S.D.N.Y. Mar. 21, 2003) ("Because [plaintiff] has failed to demonstrate that [defendant] owed [plaintiff] a duty independent of the contract, its claim for negligent misrepresentation . . . is duplicative of its breach-of-contract claims and will be dismissed."). Absent such a showing, HoldCo's negligent representation claim must be dismissed.

Some courts have suggested that if the defendant is in a special relationship with the plaintiff, which is itself a required element of a negligent misrepresentation claim, <u>see</u> <u>supra</u> Section III.B.2., then the plaintiff may sue for alleged misrepresentations that would otherwise be subsumed within a breach of contract claim. <u>See, e.g.</u>, <u>Fleet Bank v. Pine Knoll Corp.</u>, 736 N.Y.S.2d 737, 741 (App. Div. 2002) ("As a general rule, a claim for negligent misrepresentation is precluded in a breach of contract action absent a violation of a legal duty 'independent of that created by the contract.' To that end, a special relationship 'requires a closer degree of trust than an ordinary business relationship.'" (first quote quoting <u>Scott v. KeyCorp</u>, 669 N.Y.S.2d 76, 79 (App. Div. 1998)) (second quote quoting <u>Busino v. Meachem</u>, 704 N.Y.S.2d 690, 693 (2000))). At least one court in

this district has held otherwise.  See LaSalle Bank, 2003 WL 1461483, at *4.

Ultimately, the Court need not resolve this issue, as HoldCo has failed to plausibly

allege a special relationship between HoldCo and Wells Fargo.  Therefore, even if

such a relationship could authorize HoldCo to bring tort claims for violations of

contractual language, HoldCo has failed to allege that Wells Fargo owed HoldCo a

duty to draft the Invitation to Bid and Notice with care.[13]

In New York, "the vast majority of arms-length commercial transactions,

which are comprised of 'casual statements and contacts' will not give rise to

negligent misrepresentation claims."  EED Holdings v. Palmer Johnson Acquisition

Corp., 387 F. Supp. 2d 265, 281 n.9 (S.D.N.Y. 2004).  Rather, to properly state a

negligent representation claim in a commercial setting, a plaintiff must

demonstrate that the defendant "possess[es] unique or specialized expertise" or is

"in a special position of confidence and trust with the injured party such that

---

[13] Though HoldCo has not raised this argument, the Court notes that New York courts recognize a
duty to speak with care, even absent evidence of a special relationship,

> where there is a relationship between the parties such that there is an awareness
> that the information provided is to be relied upon for a particular purpose by a
> known party in furtherance of that purpose, and some conduct by the declarant
> linking it to the relying party and evincing the declarant's understanding of their
> reliance.

Houlihan/Lawrence, Inc. v. Duval, 644 N.Y.S.2d 553, 554 (App. Div. 1996); see also J & J Trading
Co. v. Republic Nat. Bank, 715 N.Y.S.2d 290, 294 (Civ. Ct. 2000) (explaining this duty arises where
"the defendant personally makes a representation to an individual and is aware of that individual's
reliance on that representation").  Perhaps if Dock Street, acting as Wells Fargo's agent, had made
allegedly false representations directly to HoldCo during the course of the January Auction, a
negligent representation claim could lie.  See, e.g., Osuchowski v. Gallinger Real Estate, 711
N.Y.S.2d 369 (Mem) (App. Div. 2000) (finding plaintiff, who purchased real estate at an auction
conducted by defendant, could pursue negligent misrepresentation claim where defendant's "agent
[allegedly] made negligent misrepresentations to plaintiff during the auction").  But as HoldCo's
claim here rests on purportedly false statements in the Notice and Invitation to Bid, which were
"circulated . . . to potential bidders" and not made to HoldCo directly (see ECF No. 38 ¶ 31), HoldCo
must plausibly plead the existence of a special relationship to proceed with its negligent
misrepresentation claim.

reliance on the negligent misrepresentation is justified." <u>Kimmell v. Schaefer</u>, 675

N.E.2d 450, 454 (N.Y. 1996). Thus, "[p]rofessionals, such as lawyers and engineers,

by virtue of their training and expertise, may have special relationships of

confidence and trust with their clients." <u>Id.</u>

Nowhere in its counterclaim does HoldCo plead that a special relationship

existed between Wells Fargo and HoldCo (<u>see</u> ECF No. 38 ¶¶ 181-85 (Count

Seven)), and the facts alleged do not permit such an inference. As an initial matter,

HoldCo does not suggest that Wells Fargo possessed unique or specialized expertise

in the auction, as any such claim would amount only to an assertion that Wells

Fargo "'had superior knowledge of the particulars of its own business practice,'"

which "'is insufficient' to show a special relationship." <u>See</u> <u>Levantino v. Starwood</u>

<u>Mortg. Capital LLC</u>, No. 15 Civ. 5349, 2015 WL 7430860, at *6 (S.D.N.Y. Nov. 20,

2015) (quoting <u>MBIA Ins. Corp. v. Countrywide Home Loans, Inc.</u>, 928 N.Y.S.2d

229, 236 (App. Div. 2011)). Rather, HoldCo argues that Wells Fargo was in a

"special position of confidence and trust" by virtue of the independent duty owed by

a seller "to all bidders in closed auctions, like the January Auction, to conduct the

auction fairly and in accordance with its terms, which duty requires an accurate

disclosure of the terms of the auction." (ECF No. 71 at 12.) This argument falters

on several grounds.

First, HoldCo has not identified a single case where a seller in an auction was

found to have a special relationship with bidders, for the purposes of a negligent

representation claim, by virtue of its duty to conduct a fair auction. (<u>See</u> ECF No.

71 at 12-13). In light of "unequivocal precedent" holding that no special relationship exists between sellers and buyers in auctions, the Court is not persuaded to adopt HoldCo's novel theory. See, e.g., Krahmer v. Christie's Inc., 903 A.2d 773, 785 (Del. Ch. 2006) (applying New York law).[14] Second, even if the same duty could support both a negligent representation and unfair auction claim, and even if HoldCo's broad formulation of this duty is correct, HoldCo's negligent representation claim would be impermissibly duplicative of the unfair auction claim, as both would turn on the same alleged breach of the same alleged duty (i.e., the failure to conduct the auction according to its terms). Cf. Nevelson v. Carro, Spanbock, Kaster & Cuiffo, 736 N.Y.S.2d 668, 670 (App. Div. 2002) (dismissing claim for breach of fiduciary duty as "redundant" of another tort claim for malpractice because claim for breach of fiduciary duty was "predicated on the same allegations and seek relief identical to that sought in the malpractice cause of action").

Third, Guggenheim and Sandler, which bid on the Subject Securities on HoldCo's behalf, expressly disclaimed having a special relationship with Wells Fargo in the Invitation to Bid and the Investors Representations and Confidentiality Agreement. (See ECF No. 38, Ex. 2 ¶ 3(h) (Invitation to Bid stating that a bid represents, among other things, that (1) "bidder has sufficient knowledge

---

[14] The Court has not found a case applying New York law where the plaintiff alleged that a seller conducting a closed auction with written bids engaged in negligent misrepresentation. Thus, the cases where courts have found no special relationship between sellers and bidders in an auction do not involve the precise circumstances where, according to HoldCo, a duty to conduct a fair auction applies. Nonetheless, the Court is also not aware of a decision reasoning that a plaintiff would have properly stated a claim for negligent representation against a seller in an auction had the plaintiff alleged that the seller had engaged in a private sale and accepted written bids.

and experience in business and financial matters to evaluate properly the merits and risks of investment in the Collateral;" (2) "bidder has had such access to information concerning the Collateral as such bidder deems necessary to make an informed investment decision and has taken advice from those advisors as such person has deemed necessary; and (3) "neither the Trustee nor any other party connected with the Sale of the Collateral is a fiduciary or investment advisor" to the bidder); see also id., Ex. 2, Ex. A ¶ 1 (Investors Representations and Confidentiality Agreement, in which bidders represented that they had "reviewed all necessary materials and had access to all information requested, and ha[d] sufficient business and investment knowledge and experience to effectively evaluate the merits and risks of investment in the Collateral").) Such disclaimers defeat HoldCo's claim as a matter of law. See, e.g., Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 785 (2d Cir. 2003) ("[A] party cannot justifiably rely on a representation that has been disclaimed by agreement.").

HoldCo contends that the disclaimers in the Invitation to Bid and Investors Representations and Confidentiality Agreement pertained only to the condition of the Collateral, not the terms of the January Auction. (ECF No. 71 at 13.) Because HoldCo takes issue with Wells Fargo's representations regarding how the Auction would be conducted, and not the state of the Collateral to be sold, HoldCo insists that the above disclaimers do not preclude its claim. (See id.) But by their plain terms, at least some of the disclaimers relate broadly to the risks associated with participating in the auction, rather than the risks associated with the products

49

themselves.  (See, e.g., ECF No. 38, Ex. 2 ¶ 3(h) (representing that "bidder has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Collateral") (emphasis added); id. Ex. 2, Ex. A ¶ 1 (representing that bidder "has reviewed all necessary materials and had access to all information requested").)  Moreover, in light of the above disclaimers, HoldCo cannot properly plead negligent misrepresentation without demonstrating that it reviewed and remained misled by the additional documents referenced in the Invitation to Bid, such as the Indenture.  (See id. Ex. 2 at 4 (informing potential bidders that "[t]he Indenture and the documents reflecting the Trustee's security interest in the Collateral are available for inspection prior to the Sales by appointment").)  As much is clear from UST Private Equity Inv'rs Fund, Inc. v. Salomon Smith Barney, 733 N.Y.S.2d 385 (App. Div. 2001), where the court held that, "[a]s a matter of law, a sophisticated plaintiff[15] cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it, such as reviewing the files of the other parties."  Id. at 386. HoldCo's negligent misrepresentation claim therefore cannot survive a motion to dismiss.

### c.  Breach of Duty to Conduct a Fair Auction

HoldCo's unfair auction claim must be dismissed because HoldCo has failed

---

[15] Guggenheim and Sandler, which bid on HoldCo's behalf, represented to Wells Fargo that they are "sophisticated investors" (see ECF No. 1 ¶ 18; ECF No. 38 ¶ 18), and HoldCo seemingly concedes that the representations made by Guggenheim and Sandler may be imputed to HoldCo for the purposes of this motion (see, e.g., ECF No 71 at 13-14 (not disputing that HoldCo would be bound by Guggenheim and Sandler's acceptance of the disclaimers regarding the state of the Collateral)).

to allege facts necessary to make out a claim.  Though New York law seemingly recognizes a duty to conduct a fair auction, "the contours of this duty are hazily defined."  Nathanson, 2010 WL 4916982, at *5).  To this Court's knowledge, plaintiffs alleging breach of the duty to conduct a fair auction have survived motions to dismiss in only three cases—each of which presents similar facts. Compare Banner Indus., Inc. v. Schwartz, 581 N.Y.S.2d 184, 184 (App. Div. 1992) (plaintiff allegedly submitted higher bid than its only other competitor, but competitor won auction by virtue of secret side-deal with defendant), with Valeo Engine Cooling, Inc. v. Guy F. Atkinson Co. of Cal., 658 N.Y.S.2d 285, 286 (App. Div. 1997) (defendant allegedly rescinded its acceptance of the plaintiff's offer in favor of a higher offer submitted after bidding had closed), and Solow v. Conseco Inc., No. 06-CV-5988, 2008 U.S. Dist. LEXIS 9234, at *5-6 (S.D.N.Y. Jan. 11, 2008) (defendant allegedly violated the procedures set forth in its invitation to bid by accepting a bid that did not comply with the auction rules (i.e., was submitted after the deadline, was not sealed, and was not a "basic" bid but instead offered extra money if another participant offered a higher bid)).  Plaintiffs in all three cases, then, effectively alleged that their respective competitions were rigged.  The sellers did not simply deviate from the terms of the auction, but did so in a way that was "unfair"—i.e., in a way that advantaged some bidders over others.

HoldCo does not allege any such "sham" here.  Rather, HoldCo asserts that Wells Fargo held an auction with reserve even though its procedures announced that the auction would be without reserve.  (See ECF No. 38 ¶¶ 181-85.)  Without

any guidance from New York courts as to the contours of the duty to conduct a fair auction, this Court declines to extend the duty beyond where it has already been recognized.  Cf. Trans World Metals, Inc. v. Southwire Co., 769 F.2d 902, 908 (2d Cir. 1985) ("As a federal court sitting in diversity, we will not extend the application of this state law.").  Therefore, HoldCo has not made out a prima facie case for breach of the duty to conduct a fair auction, and this cause of action is dismissed.

### d. Economic Loss Doctrine

As a final point, Wells Fargo insists that each of HoldCo's four tort claims are also barred by the economic loss doctrine (see, e.g., ECF No. 81 at 5), which New York courts developed "to keep contract law 'from drown[ing] in a sea of tort,'" Carmania Corp., N.V. v. Hambrecht Terrell Int'l, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) (quoting E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866 (1986)).  Though the economic loss doctrine is "frequently invoked, it is ordinarily with sparse analysis or explanation."  Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 246 n.7 (S.D.N.Y. 2006)).  There appear to be, among New York courts and federal courts applying New York law, two versions of the rule in play.  The broad version of the doctrine "restrict[s] plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains." Carmania Corp., N.V., 705 F. Supp at 938.  "Economic loss," in these cases, includes damages that would not necessarily be recoverable in contract (i.e., out-of-pocket expenses and other monetary outlays).  See, e.g., Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204, 220 (S.D.N.Y. 2007) (applying this

version of the rule to bar recovery of compensatory damages in negligent misrepresentation claim).  In such cases, plaintiffs alleging pecuniary loss may either recover for breach of contract (if they have a viable contractual claim) or not at all.  See Cherny v. Emigrant Bank, 604 F. Supp. 2d 605, 609 (S.D.N.Y. 2009) (holding plaintiff required to sue under contract rather than tort because plaintiff "has not suffered any personal or property damage," and dismissing plaintiff's contractual claims for failure to allege "an actual injury for which damages are appropriate").

The narrower version of the doctrine precludes recovery in tort only where "the damages suffered are of the type remediable in contract." Carmania Corp., N.V., 705 F. Supp at 938.  In this formulation, a contracting party may not recover expectation damages in a tort action, see 17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am., 693 N.Y.S.2d 554, 559 (1999), but would not be barred from recovering tort-based damages—even if such damages stemmed from purely pecuniary loss, see Sofi Classic S.A. de C.V., 444 F. Supp. at 247 (finding that "the 'economic loss' contemplated by the rule would generally encompass types of injuries and resulting damages that embody future financial harms . . . that could be anticipated and bargained for in contracts."  Id. at 246 n.7.).

With perhaps the exception of HoldCo's claim for breach of the duty to conduct a fair auction,[16] HoldCo's tort claims are barred under the broad version of

---

[16] Some courts have found that an exception to the economic loss rule applies "where the defendant has a duty independent of contractual obligations."  See Nebraskaland, Inc. v. Sunoco, Inc., No. 10 CV 1091 (RJD), 2011 WL 6131313, at *4 (E.D.N.Y. July 13, 2011) (quoting Rochester-Genesee Reg'l Transp. Auth. v. Cummins Inc., No. 09-CV-6370, 2010 WL 2998768, at *8 (W.D.N.Y. July 28, 2010)),

the rule, as even the claims that seek compensatory and punitive damages allege purely monetary losses. The Court need not determine whether HoldCo's claims would also falter under the narrower version of the doctrine, as each claim has been separately dismissed on other grounds.

### 3. Leave to Amend

HoldCo requests leave to amend its counterclaims "to plead appropriate tort claims after the Court determines the pending cross-motions for summary judgment." (ECF No. 71 at 16-17.) HoldCo seems to think that if its contractual claims fail (which they have), it should be allowed to reassert its otherwise duplicative tort claims. (See id.) Not so. The trouble with HoldCo's conversion, replevin and negligent representation claims is that each truly "lie[s] in the nature of breach of contract as opposed to tort." Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 16 (2d Cir. 2000). It does not matter that a contract was never actually formed between HoldCo and Wells Fargo; the point, instead, is that HoldCo "was not owed a legal duty separate and apart from obligations bargained for and subsumed within the transaction." King Cty., Wash. v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d 288, 303 (S.D.N.Y. 2012), rev'd in part on other

---

report and recommendation adopted, No. 10 CV 1091 (RJD)(CLP), 2011 WL 6131298 (E.D.N.Y. Dec. 8, 2011). Here, HoldCo has identified an independent duty in connection with its claim that Wells Fargo failed to conduct a fair auction, and thus courts recognizing this exception would not bar recovery for the economic losses asserted in Count Six. However, not all courts applying New York law recognize this exception. See, e.g., Manhattan Motorcars, Inc., 244 F.R.D. at 220 (S.D.N.Y. 2007) ("The fact that the duty breached here is independent of any contract between the parties merely prevents this claim from being dismissed as duplicative of [plaintiff's] breach of contract claims. It does not allow evasion of the economic loss rule, which presents a second, distinct barrier."). But see King Cty., Wash. v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d 288, 304 (S.D.N.Y. 2012) (Judge Scheindlin, who authored Manhattan Motorcars, calling this aspect of that decision into question), rev'd in part, No. 09 CIV. 8387, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012).

grounds, No. 09 Civ. 8387, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012). Where, as here, a plaintiff cannot identify "a legal duty independent of the contract itself" upon which to hook its claims, the claims must be dismissed. See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1992). And though HoldCo has identified a cognizable tort duty in connection with its claim for breach of the duty to conduct a fair auction, it will remain unable to plausibly plead breach. As a result, HoldCo's request to amend its pleadings is denied. See Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend.").

IV.     CONCLUSION

        For the foregoing reasons, Wells Fargo's motion for summary judgment is GRANTED; HoldCo's motion for summary judgment is DENIED; HoldCO's motion for relief pursuant to Rule 56(d) is DENIED; and Wells Fargo's motion to dismiss is GRANTED as to Counts Four through Seven and DENIED as to Counts One through Three, which are separately dismissed as moot.

        SO ORDERED.

Dated:      New York, New York
            July 11, 2017

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge